T.C. Memo. 2011-228

UNITED STATES TAX COURT

CHARLES L. GARAVAGLIA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MARY ANN T. GARAVAGLIA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2500-07, 14693-09.    Filed September 26, 2011.

Joseph Falcone and Fred A. Foley, for petitioners.

Alexandra E. Nicholaides, John J. Comeau, and Robert M. Romashko, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  These consolidated cases concern the 1989 and 1990 Federal income taxes of Charles L. Garavaglia (Mr. Garavaglia) and Mary Ann T. Garavaglia (Ms. Garavaglia)

(collectively, the Garavaglias or petitioners).  Respondent determined deficiencies in Mr. Garavaglia's 1989 and 1990 Federal income taxes of $97,070 and $114,435 and fraud penalties under section 6663(a) of $72,803 and $85,826, respectively.[1] Respondent amended the answer to assert deficiencies in Mr. Garavaglia's 1989 and 1990 Federal income taxes of $96,640 and $138,290 and fraud penalties of $72,480 and $103,717 pursuant to section 6663(a), respectively; or alternatively, a deficiency of $114,435 in Mr. Garavaglia's 1990 Federal income tax and a fraud penalty of $85,827 under section 6663(a).  Respondent contends that the deficiencies and penalties purportedly due from Mr. Garavaglia stem from Mr. Garavaglia's participation in a scheme to defraud workers' compensation insurance companies (insurance companies) and the U.S. Treasury (Treasury).  Mr. Garavaglia disavows his participation in such a scheme during 1989 and 1990.

Respondent also determined deficiencies of $99,179 and $117,557 in Ms. Garavaglia's 1989 and 1990 Federal income taxes and accuracy-related penalties under section 6662(a) of $19,836 and $23,511, respectively.  Ms. Garavaglia ascribes error to respondent's determinations as to the fraud of Mr. Garavaglia, and asserts that (1) the period of limitations for assessment has

---

[1]Unless otherwise indicated, section references are to the applicable version of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.

expired as to 1989 and 1990; and (2) she is entitled to relief from joint and several liability under section 6015(b) and (f). Respondent counters that the period of limitations for assessment as to 1989 and 1990 is on account of the alleged fraud of Mr. Garavaglia, or alternatively on account of the claimed fraud of petitioners' return preparers. Respondent also contends that Ms. Garavaglia is jointly and severally liable for any deficiencies determined to be due from Mr. Garavaglia.

After concessions,[2] the primary issues for decision are: (1) Whether either of two corporations partially owned by Mr. Garavaglia qualifies as an electing small business corporation (S corporation) in 1989 and 1990. We hold that neither does;[3] (2) whether Mr. Garavaglia omitted income of $326,815 and $386,324 in 1989 and 1990, respectively. We hold he did to the extent stated herein; (3) whether Mr. Garavaglia is liable for fraud penalties under section 6663. We hold he is; (4) whether the period of limitations for assessment of petitioners' 1989 and 1990 taxes is

---

[2]Mr. Garavaglia contends that he is entitled to a "refund of his excess social security tax payments". He offers no argument, explanation, or legal authority to support his position, and we treat his claim to a refund as improperly raised. See Figuero-Rubio v. INS, 108 F.3d 110, 112 (6th Cir. 1997).

[3]Given our holding on the first issue, respondent abandons his primary determination that Mr. Garavaglia's distributable share of income and/or loss from these corporations should be increased for 1989 and 1990.

open on account of the fraud of Mr. Garavaglia. We hold it is;[4] (5) whether Ms. Garavaglia is jointly and severally liable for deficiencies determined to be due from Mr. Garavaglia. We hold she is; (6) whether Ms. Garavaglia is liable for accuracy-related penalties under section 6662(a). We hold she is not; (7) whether Ms. Garavaglia is entitled to relief from joint and several liability under section 6015(b) or (f). We hold she is not; and (8) whether the Criminal Investigation Division (CID) of the Internal Revenue Service (IRS) violated Mr. Garavaglia's Fifth Amendment right to due process. We hold it did not.

## FINDINGS OF FACT

### I.  Preliminaries

The parties submitted to the Court numerous stipulations of fact and accompanying exhibits. The Court also deemed some facts and exhibits established pursuant to Rule 91(f). The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. We find the stipulated facts accordingly. Petitioners, husband and wife, resided in Michigan when they filed their respective petitions.

---

[4]Because we find fraud on the part of Mr. Garavaglia, we need not consider respondent's alternative position that the period of limitations for assessment is open on account of the fraud of petitioners' return preparers.

## II. Mr. Garavaglia

Mr. Garavaglia was born in Detroit, Michigan. He graduated from high school, and he has some college education. He was an active duty member of the U.S. Army from July 1, 1957, until July 12, 1959, and served as a supply clerk. Mr. Garavaglia has been known by many aliases including, among others, Timothy Sullivan, Robert Burton, and Albert Little.

In the early-to-mid-1960s Mr. Garavaglia began working as a labor consultant for Central Transport, Inc. (Central). From 1966 to 1975 he was director of insurance and safety. As such, he established a claims department, developed investigative procedures, and prepared guidelines for claims settlements. From 1975 to 1986, as vice president of industrial relations and security, he developed security procedures, negotiated labor agreements, and directed the labor departments of U.S. and Canadian divisions and subsidiaries. Mr. Garavaglia was fired from Central in approximately October 1986. Pursuant to a settlement agreement with Central, he was paid an annual consulting fee of $50,000. That fee was paid to Mr. Garavaglia's wholly owned S corporation.

Since the early-to-mid-1960s Mr. Garavaglia has developed expertise in the insurance, employee leasing, trucking, and labor industries. During 1989 and 1990 he owned and operated one labor

consulting firm and various employee leasing companies, all of which were within the trucking industry.

III. C&G Consultants

Mr. Garavaglia was the president and 100-percent owner of C&G Consultants, Inc. (C&G Consultants), an S corporation. Through C&G Consultants, Mr. Garavaglia provided labor consulting services and received payments from the employee leasing companies which he owned and operated.

IV. Ms. Garavaglia

Ms. Garavaglia graduated from high school without further education. She married Mr. Garavaglia in September 1961, gave birth to a child shortly thereafter, and was a homemaker until at least 1988. As of the end of 1988, the Garavaglias had financial assets of approximately $1 million. At all relevant times, the Garavaglias were married.

Throughout 1989 Ms. Garavaglia worked as a secretary with a temporary staffing company. She also worked as a secretary for at least one of Mr. Garavaglia's employee leasing companies, and was paid a weekly salary of $500 for her services. Ms. Garavaglia was the treasurer of C&G Consultants, and she attended the meeting of the board of directors of that company.

V. Mr. Rogers

George Rogers (Mr. Rogers) worked at Central for 11 years, initially as a truck driver and later in the operations division.

In the early 1980s Mr. Rogers began to manage at least one of Central's employee leasing companies. He grew independent of Central over time, and he eventually came to own and operate at least four employee leasing companies.

Messrs. Garavaglia and Rogers met while at Central. At first Mr. Garavaglia advised Mr. Rogers on the resolution of labor-related issues such as the filing of union grievances. In 1985 that relationship developed into a business partnership that continued until 1989.

## VI. Sentury

Mr. Rogers was the 100-percent owner of Sentury Services, Inc. (Sentury), an S corporation. Mr. Rogers, through Sentury, provided consulting services to his employee leasing companies. Mr. Rogers owned at least two of these employee leasing companies jointly with Mr. Garavaglia.

## VII. The Yarnell Family and LTD Accounting

During 1985 and 1986 Douglas Yarnell (Mr. D. Yarnell) and Leroy Yarnell (Mr. L. Yarnell) worked in the accounting department of D&S Leasing (D&S), an employee leasing company which Mr. Rogers owned. Mr. L. Yarnell helped to implement a computer-based payroll system and assisted in the preparation of various tax returns, including Forms 941, Employer's Quarterly Federal Tax Return. Mr. L. Yarnell was not a certified public accountant, though he represented to others, including Mr.

Garavaglia, that he was.  In July 1986 Mr. D. Yarnell left D&S to form LTD Accounting, Inc. (LTD Accounting), with his father, Mr. L. Yarnell, and his brother, Tim Yarnell (Mr. T. Yarnell).[5]  LTD Accounting or members of the Yarnell family performed various accounting and tax duties for petitioners, C&G Consultants, and certain employee leasing companies owned by Mr. Garavaglia.

VIII. Overview of Employee Leasing Companies

Mr. Garavaglia, either with Mr. Rogers or Mr. L. Yarnell, owned and operated at least three employee leasing companies.  An employee leasing company is a business which agrees to place employees of a client company on the leasing company's payroll, usually for a fee.  Through this leasing arrangement, the employee leasing company typically becomes the primary employer of record and performs a number of personnel and administrative functions with respect to the leased employees.  Among the services typically provided by the employee leasing company were issuing paychecks, payroll management, Federal and State income tax withholding, Federal and State employment tax reporting, and maintaining workers' compensation insurance.  See, e.g., Bealor v. Commissioner, T.C. Memo. 1996-435.  The client companies paid workers' compensation insurance premiums (premiums) and taxes to

---

[5]The Yarnell family owned and operated two accounting firms named LTD Accounting, which we collectively refer to as LTD Accounting.  We also collectively refer to Mr. L. Yarnell, Mr. D. Yarnell, and Mr. T. Yarnell, as the Yarnell family.

the employee leasing company, with portions of the funds being allocated among various payees, including insurance companies, and Federal and State taxing authorities.

Premiums due to the insurance companies were generally due at the beginning of a specified policy period (e.g., from May until the following April). The premiums were self-reported and determined, at least in part, by worker classification, payroll wages, and the State in which the leased employee worked. Because Mr. Garavaglia's employee leasing companies serviced the trucking industry, the relevant worker classifications included drivers, maintenance workers, and office staff. Worker classifications with a higher risk of injury (e.g., drivers) generally required higher premiums than those with a lower risk of injury (e.g., office staff). Because the numbers and types of workers varied over a specified policy period, employee leasing companies prospectively estimated their payroll for the policy period.

Given the self-reporting nature of the employee leasing business, there was risk to the insurance companies that the employee leasing company might underreport its payrolls and the premiums due. To mitigate this risk, the insurance companies often used audits to ensure that the employee leasing company's payrolls were accurately reported. The audits were intended to balance the estimated premiums paid and the actual premiums due

by reconciling the payrolls as estimated by the employee leasing company against the actual payrolls as determined by an auditor.

The auditor, who was sometimes an employee of the insurance company, examined various documentation to verify the employee leasing company's actual payroll. Documents typically examined included Forms 941, Employer's Quarterly Federal Tax Return, worker classifications, State unemployment payroll taxes, various classifications of the policy, and proof of payment as to those classifications. To the extent that the auditor determined a deficit between the client company's audited and estimated payrolls, the employee leasing company was required to satisfy the shortfall. To the extent that the auditor determined an overpayment, the insurance company credited the employee leasing company.

During 1989 and 1990 Mr. Garavaglia's employee leasing companies underreported their actual payrolls by approximately 75 percent. As a result, these employee leasing companies also understated the premiums due to the insurance companies and the employment taxes due to Federal and State taxing authorities. For financial accounting purposes, however, these employee leasing companies expensed 100 percent of the premiums as if the full payrolls of the client companies had been reported. For Federal tax purposes, these employee leasing companies reported deductions equal to the higher premium expenses recorded for

financial accounting purposes.  The difference between the amounts which the employee leasing company collected from its client companies and the amounts actually remitted to the insurance companies and taxing authorities was distributed to owners of the employee leasing companies; namely, Mr. Garavaglia, and either Mr. Rogers or Mr. L. Yarnell.  The amount of each distribution was generally proportionate to the owner's interest in the company.

IX.  Trans Continental

By 1988 Mr. Garavaglia and Mr. Rogers were each 50-percent owners in Trans Continental Leasing, Inc. (Trans Continental), an employee leasing company.  In late 1988 or early 1989 Trans Continental underwent a workers' compensation audit which Mr. D. Yarnell handled.  The auditor determined a shortfall of as much as $1 million in the premiums which Trans Continental owed to the insurance company.  As of March 31, 1989, Trans Continental had accrued premium expenses of $59,087 though it had paid premiums to the insurance companies of only $21,102.  Thus, as of March 31, 1989, Trans Continental had overstated its workers' compensation expense for 1989 by $37,985 ($59,807 less $21,102).

Trans Continental did not pay the amounts determined to be due following the audit.  Rather, Messrs. Garavaglia and Rogers closed Trans Continental in March 1989 and continued their

employee leasing business under a parallel company; namely, Trans International Services, Inc. (Trans International).

X.   Trans International

   A.   History of Trans International

On or about March 6, 1989, Messrs. Garavaglia and Rogers incorporated Trans International as an employee leasing company. Mr. Garavaglia and Mr. Rogers each became 50-percent shareholders in Trans International, and they shared equally in all decisions related to that company.

   B.   The Continuation of Trans Continental's Operations

By early April 1989, Trans International was a fully operating employee leasing company, complete with assets, employees, customers, payables, receivables, and accruals.  The ending balances of Trans Continental's expense accounts for Michigan, Ohio, and Indiana became Trans International's starting balances for their accrued workers' compensation accounts.  For example, as of March 31, 1989, Trans Continental had ending balances in its accrued workers' compensation expense account for Michigan, Ohio, and Indiana, of $17,974, $4,799, and $36,315, respectively.  Those ending balances became Trans International's beginning balances for April 1, 1989.  Thus, the $37,985 shortfall which Messrs. Garavaglia and Rogers avoided by closing Trans Continental was transferred to Trans International.

C.    Payroll Misstatements

On or sometime after April 1, 1989, Mr. T. Yarnell prepared and forwarded to Mr. Rogers two payroll summaries which Trans International used to calculate its premiums.  The first summary listed Trans International's "actual" payroll for the first quarter of 1989, and the second summary listed Trans International's "modified" payroll for the same period.  The modified payroll summary was calculated by applying a 25-percent factor to the actual payroll; i.e., Trans International reported only 25 percent of its actual payroll.  The actual payroll summary reported that Trans International owed $60,416 in workers' compensation insurance liabilities for the first quarter of 1989.  Of that amount, $36,799 was allocable to workers in Indiana, $18,751 was allocable to workers in Michigan, and $4,866 was allocable to workers in Ohio.  The modified payroll summary, on the other hand, reported that Trans International owed $15,104 in workers' compensation insurance liabilities for the first quarter of 1989.  Of that amount, $9,200 was allocable to workers in Indiana, $4,688 was allocable to workers in Michigan, and $1,216 was allocable to workers in Ohio.

Mr. T. Yarnell also prepared payroll summaries for the last two quarters of 1989 which "[scaled] down" Trans International's payroll to 25 percent of actual.  These scaled-down summaries were used by Trans International to calculate its premiums and

were reported to the insurance companies.  At some point on or before January 31, 1990, Mr. T. Yarnell sent to Mr. Garavaglia the following letter:

> Premiums for Ohio Workman's Compensation are due by January 31, 1990.  Please review the schedules I have prepared for Branch [International] and * * * [Trans International] and let me know if you agree with the figures.  The only classification I did not scale down to 25% was the * * * [Trans International] drivers because of the low amount that we carry in Ohio for this classification.  The highlighted Reported * * * [Workers' Compensation] is the amounts I am proposing to pay into the Ohio Bureau of * * * [Workman's Compensation].

Attached to that letter was a schedule which reported Trans International's actual and modified payroll wages as follows:

| Period | Drivers | Maintenance | Office | Total |
|--------|---------|-------------|--------|-------|
| July 1989 | $1,530 | $11,043 | $11,138 | $23,711 |
| Aug. 1989 | 1,704 | 13,769 | 11,890 | 27,363 |
| Sept. 1989 | 2,013 | 16,507 | 14,045 | 32,565 |
| Oct. 1989 | 1,740 | 15,047 | 11,187 | 27,974 |
| Nov. 1989 | 1,727 | 13,135 | 11,040 | 25,902 |
| Dec. 1989 | 3,576 | 24,683 | 18,421 | 46,680 |
| Total wages[1] | 12,289 | 94,184 | 77,721 | 184,194 |
| Reported wages | $12,289 | $23,546 | $19,430 | $55,265 |
| Actual workers' compensation billed to customers | $1,789 | $11,359 | $163 | $13,311 |
| Reported workers' compensation | $1,735 | $1,907 | $121 | $3,763 |

[1]The sum for the periods may not equal the total wages on account of rounding.

In the foregoing table, the term "total wages" means the wages which Trans International actually paid to its employees.  The

term "reported wages" means the wages which Trans International reported to the insurance companies as being paid to its employees. The phrase "actual workers' compensation billed to customers" means the actual workers' compensation billed to Trans International's client companies. The term "reported workers' compensation" means the liability which Trans International reported as due to the insurance companies. Between July and December 1989 Trans International underreported its payroll wages by up to 75 percent and understated its premiums by as much as 83 percent.[6]

D.   Books and Records

From January through March 1989 LTD Accounting kept Trans International's books and records under Trans Continental's name. After April 1, 1989, the books and records of Trans International were kept in that company's name.

E.   Accrual of Workers' Compensation Expense

Trans International maintained an accrued workers' compensation expense account on its books. That account recorded amounts which Trans International actually paid to the insurance companies as a payable account to Trans International for amounts

---

[6]Trans International paid its maintenance staff wages of $94,184 but reported payroll wages paid of $23,546, which is 25 percent of $94,184. Trans International billed its client companies $11,359 for workers' compensation expenses related to its maintenance staff but reported a liability due to the insurance companies of $1,907, approximately 17 percent of $11,359.

owed to the insurance companies.  When premiums were paid to the insurance company, the accrued workers' compensation account was credited and the cash account was debited.

      F.    <u>Payment of Premiums to Wholly Owned S Corporations</u>

Trans International billed and collected from its client companies on the basis of the actual payroll but paid the insurance companies on the basis of the modified payroll.  The difference between the actual amount billed and the modified amount paid was retained by Trans International and distributed to C&G Consultants and Sentury.  As reflected in Trans International's general ledger, in 1989 Trans International paid to C&G Consultants, Mr. Garavaglia, Sentury, and Mr. Rogers $99,090, $11,033, $90,662, and $11,033, respectively.  Trans International debited these payments from its accrued workers' compensation account.

      G.    <u>Payment of Consulting Fees to C&G Consultants</u>

Trans International also paid consulting fees of $60,233 to C&G Consultants during 1989.  These payments were recorded on Trans International's general ledger, were generally made weekly, and ranged in amounts between $420 and $8,112.

      H.    <u>Attempted Subchapter S Election</u>

On March 7, 1989, Trans International filed with the IRS a Form 2553, Election by a Small Business Corporation, electing to be treated as an S corporation effective January 1, 1989.

Specifically, that Form 2553 was signed by Mr. L. Yarnell in his capacity as Trans International's secretary. The consent statement was signed by Mr. D. Yarnell in his alleged capacity as Trans International's sole shareholder. By letter dated June 14, 1989, the IRS notified Trans International that its Form 2553 could not be processed because additional information was needed. That letter stated that Trans International needed to submit (1) a consent statement for each shareholder and (2) a signature and title of an officer. On July 11, 1989, Mr. L. Yarnell sent to the IRS a letter which stated that he was returning the IRS' letter of June 14, 1989, and a completed Form 2553. The record does not contain a copy of the Form 2553 purportedly included with this letter.

I.   Federal Income Tax Returns

1.   1989 Trans International Return

Trans International filed a 1989 Form 1120S, U.S. Income Tax Return for an S Corporation, on or about March 14, 1990 (1989 Trans International return). The 1989 Trans International return reported gross receipts or sales of $5,527,339, cost of goods sold and/or operations of $4,713,931, other income of $1,556, and total income of $814,964. The 1989 Trans International return also reported total deductions of $810,373, including $78,716 for officer compensation, $423,750 for payroll taxes, $183,433 for employee benefits programs, $161 for advertising, and $124,313

for other deductions.  After netting its income and deductions, Trans International reported ordinary income from trade or business activities for 1989 of $4,591.  The 1989 Trans International return was prepared by Mr. T. Yarnell.

    2.    1990 Trans International Return

Trans International filed a 1990 Form 1120S on or about March 5, 1991 (1990 Trans International return).  The 1990 Trans International return reported gross receipts or sales of $1,226,186, cost of goods sold of $1,072,369, and total income of $153,817.  The 1990 Trans International return also reported total deductions of $163,292, including $126,088 for payroll taxes and $37,204 for other deductions.  After netting its income and deductions, Trans International reported an ordinary loss from trade or business activities for 1990 of $9,475.  The 1990 Trans International return was prepared, but not signed, by "Central Mich. Computer Support".

    J.    Winding Up of Trans International

Trans International operated until approximately March 1990. Before the 1989 Trans International return was filed, Messrs. Garavaglia and Rogers had a "falling out".  Mr. Garavaglia accused Mr. Rogers of embezzling money from Trans International, and Mr. Rogers claimed that members of the Yarnell family had set him up.  Following that dispute, Mr. Garavaglia and the Yarnell family sided with each other and continued to do business with

each other under a parallel employee leasing company; namely, Branch International Services, Inc. (Branch International).

XI. Branch International

A. History of Branch International

On or about March 29, 1989, Mr. Garavaglia and Mr. L. Yarnell incorporated Branch International. That company was owned 70 percent by Mr. Garavaglia and Ms. Garavaglia, and 30 percent by Mr. L. Yarnell and his wife.

B. Payroll Misstatements

As discussed above, at some point on or after January 30, 1990, Mr. T. Yarnell sent to Mr. Garavaglia a letter which stated that Branch International's payroll as reported to the insurance companies was "[scaled] down" to 25 percent of actual. Attached to that letter was a schedule reporting Branch International's actual and modified payroll wages as follows:

| Period | Drivers | Maintenance | Office | Total |
|--------|---------|-------------|--------|-------|
| July 1989 | -0- | -0- | -0- | -0- |
| Aug. 1989 | -0- | -0- | -0- | -0- |
| Sept. 1989 | $25,024 | $9,046 | $8,461 | $42,531 |
| Oct. 1989 | 35,495 | 10,572 | 11,710 | 57,777 |
| Nov. 1989 | 41,983 | 11,864 | 11,279 | 65,125 |
| Dec. 1989 | 45,848 | 12,956 | 15,835 | 74,638 |
| Total wages[1] | 148,350 | 44,437 | 47,285 | 240,071 |
| Reported wages | $37,087 | $11,109 | $11,821 | $60,018 |
| Actual workers' compensation billed to customers[2] | $22,316 | $2,206 | $113 | $24,635 |

| Reported workers' | | | | |
|---|---|---|---|---|
| compensation | $5,235 | $900 | $74 | $6,209 |

[1]The sum for the periods may not equal the total wages because of rounding.

As with Trans International, the term "total wages" means the total wages which Branch International actually paid its employees. The term "reported wages" means the wages which Branch International reported to the insurance companies. The phrase "actual workers' compensation billed to customers" means the actual workers' compensation that Branch International billed to Branch International's client companies. By reporting the lower figure to the insurance companies, Branch International understated the premiums due to the insurance companies.

C.   Accrual of Workers' Compensation Expense

Like Trans International, Branch International maintained an accrued workers' compensation account on its books. This account represented a payable to Branch International for amounts owed to the insurance companies. When the payment was made to the insurance companies, the accrued workers' compensation account was credited and cash was debited. During December 1989 Branch International paid by check $21,000 to C&G Consultants, or 70 percent of the amounts debited to the accrued workers' compensation account for that month. Also in December 1989 Branch International paid by check to Mr. L. Yarnell, Mr. T.

Yarnell, or LTD Accounting $9,000 or 30 percent of the amounts debited to the accrued workers' compensation account.

D.    Payment of Premiums to Wholly Owned S Corporations

Branch International also billed and collected from its client companies on the basis of the actual payroll but paid insurance companies on the basis of the modified payroll. The difference between the amounts billed and the amounts paid was distributed from Branch International to C&G Consultants and LTD Accounting, Mr. L. Yarnell, or Mr. T. Yarnell.

Between May 4 and December 27, 1989, Mr. L. Yarnell, Mr. T. Yarnell, or Mr. Garavaglia endorsed about 39 checks totaling $71,645 from Branch International to C&G Consultants. These checks ranged from $1,120 to $8,500 and were generally paid weekly. During the same period Branch International paid $29,389 through 39 separate checks to LTD Accounting, Mr. L. Yarnell, or Mr. T. Yarnell. These checks ranged from $235 to $3,000 and were generally paid weekly. In general, checks issued to C&G Consultants, LTD Accounting, Mr. L. Yarnell, or Mr. T. Yarnell were paid on the same date and reflected Branch International's ownership structure; i.e., 70 percent was paid to C&G Consultants and 30 percent was paid to LTD Accounting, Mr. L. Yarnell, or Mr. T. Yarnell.

During 1990 Branch International endorsed 96 checks totaling $329,805 to C&G Consultants.  The amounts of those checks ranged from $750 to $10,000, and they were generally drafted weekly.

E.   Subchapter S Election

On November 10, 1989, Branch International filed with the IRS a Form 2553 electing to be treated as an S corporation effective September 15, 1989.  Mr. T. Yarnell signed that Form 2553 as an officer of Branch International.  The consent statement was signed by Mr. Garavaglia and Mr. T. Yarnell in their alleged capacities as Branch International's sole shareholders.[7]  Branch International received notice that the election to be treated as an S corporation was accepted on or about January 29, 1990.  The IRS revoked Branch International's election to be treated as an S corporation without explanation on or about April 23, 1990.

F.   Federal Income Tax Return for Branch International

1.   1989 Branch International Return

Mr. T. Yarnell filed a 1989 Form 1120S on behalf of Branch International on or about March 9, 1990 (1989 Branch International return).  The 1989 Branch International return reported gross receipts or sales of $1,206,271, cost of goods sold and/or operations of $1,040,888, and total income of

---

[7]We observe that Mr. T. Yarnell was not a shareholder of Branch International.

$165,383. The 1989 Branch International return also reported total deductions of $169,401, consisting of $78,716 for officer compensation, $83,804 for payroll taxes, and $85,597 for other deductions. The 1989 Branch International return thus reported an ordinary loss from trade or business activities of $4,018. The 1989 Branch International return was prepared but not signed by LTD Accounting.

### 2. 1990 Branch International Return

Mr. Garavaglia filed a 1990 Form 1120, U.S. Corporation Income Tax Return, on behalf of Branch International on or about April 18, 1991 (1990 Branch International return). The 1990 Branch International return reported gross receipts or sales of $8,973,319, cost of goods sold and/or operations of $8,542,264, and total income of $431,055. The 1990 Branch International return also reported total deductions of $443,639, consisting of $600 for repairs, $10,100 for rents, $17,987 for interest, $42,231 for depreciation, and $372,721 for other deductions. The 1990 Branch International return thus reported taxable income of negative $12,584. The 1990 Branch International return was prepared by "Central Mich. Computer Support" and signed by a member of the Yarnell family.

G.   The Yarnell Family Withdraws From Branch International

On January 31, 1991, Mr. L. Yarnell ceased being an officer of Branch International, and on March 28, 1991, Mr. L. Yarnell worked for Branch International on a "contract type basis".

XII. Payments From C&G Consultants to Mr. Garavaglia

In 1989 Mr. Garavaglia wrote himself more than 50 separate checks from C&G Consultants totaling $104,939.  The amounts endorsed on these checks ranged from $550 to $13,250.  In 1990 Mr. Garavaglia wrote approximately 40 separate checks totaling $204,818 payable from C&G Consultants to himself.  The amounts endorsed on these checks ranged from $250 to $14,000.  The 90 checks endorsed from C&G Consultants to Mr. Garavaglia in 1989 and 1990 were written almost weekly.

XIII.  Petitioners' Joint Returns

A.   1989 Joint Return

Petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for 1989 (1989 joint return).  The 1989 joint return reported total wages of $84,531, including $74,223 of wages which Mr. Garavaglia earned from Trans International.  Attached to the 1989 joint return was Schedule E, Supplemental Income and Loss, which reported a $23,265 loss from C&G Consultants, a $2,813 loss from Branch International, and income of $2,295 from Trans International.  The 1989 joint return was prepared by Mr. L. Yarnell.

B.    1990 Joint Return

Petitioners filed a joint Form 1040 for 1990 (1990 joint return).  The 1990 joint return reported total wage income of $47,935, consisting of wages paid to Mr. and Ms. Garavaglia by (1) Branch International in the amounts of $18,000 and $13,000, respectively and (2) Trans International in the amounts of $7,786 and $9,149, respectively.  Attached to the 1990 joint return was Schedule E, which reported $6,059 in income from C&G Consultants, a $4,737 loss from Branch International, and a $2,295 gain from Trans International.  The 1990 joint return also reported unemployment compensation of $7,150.  The 1990 joint return was prepared, but not signed, by "Central Mich. Computer Support".

XIV. C&G Consultants' Returns

A.    1989 C&G Consultants Return

Mr. Garavaglia filed a 1989 Form 1120S on behalf of C&G Consultants (1989 C&G Consultants return).  The 1989 C&G Consultants return reported $50,000 of gross receipts or sales, $23,268 of other income, total deductions of $96,533, and total ordinary losses of $23,265.  The 1989 C&G Consultants return did not report any income from Trans or Branch International.  That return was prepared by Mr. T. Yarnell of LTD Accounting.

B.    1990 C&G Consultants Return

Mr. Garavaglia filed a 1990 Form 1120S on behalf of C&G Consultants (1990 C&G Consultants return).  The 1990 C&G

Consultants return reported $50,000 of gross sales or receipts, other income of $33,889, total deductions of $77,830, and total ordinary income of $6,059. The 1990 C&G Consultants return was prepared, but not signed, by "Central Mich. Computer Support". Attached to the 1990 C&G Consultants return was Schedule K-1, Shareholder's Share of Income, Credits, Deductions, Etc., which reported the pro rata share of C&G Consultants' $6,059 ordinary income as fully allocable to Mr. Garavaglia. The 1990 C&G Consultants return did not report any income from Trans International or Branch International. The 1990 C&G Consultants return was prepared by Mr. L. Yarnell.

XV. Criminal Investigation of Mr. Garavaglia

A. Tipoff of Mr. Garavaglia's Criminal Activity

In November 1991 a confidential informant contacted CID with information that Mr. Garavaglia evaded taxes through two separate schemes which were perpetrated by at least three corporations partially owned by Mr. Garavaglia. In late 1991 or early 1992, CID contacted Messrs. D. and L. Yarnell regarding their knowledge of any wrongdoing regarding unreported income by Branch International and Mr. Garavaglia. Mr. L. Yarnell did not tell Mr. Garavaglia that CID had contacted him.

B. Preliminary Meetings With the IRS

In early 1992 special agents with CID held a meeting with Mr. L. Yarnell and Mr. D. Yarnell. During that meeting, Mr. L.

Yarnell stated that he had prepared Federal income tax returns for Mr. Garavaglia and C&G Consultants.  Mr. L. Yarnell also stated that he did not think that those returns were accurate or that Mr. Garavaglia reported all of his income on those returns.

Sometime in April 1992, special agents with CID held a second meeting with Mr. L. Yarnell and Mr. D. Yarnell.  That meeting was tape recorded.  During that meeting CID offered Mr. L. Yarnell immunity for information which was offered during the question and answer portion of the second meeting.  At that meeting, CID's special agents presented various tax returns from Mr. Garavaglia's corporations to Mr. L. Yarnell and questioned him on those returns.  Although various corporate returns were presented to Mr. L. Yarnell, the CID special agents' focus was Mr. Garavaglia and C&G Consultants.

C.    Wiretap

The IRS conducted telephone monitoring of conversations between Mr. Garavaglia and Mr. L. Yarnell on July 14 and 16, 1992.  Mr. Garavaglia was unaware that these conversations were being taped.

D.    Execution of Warrants

On July 14, 1992, the U.S. District Court for the Eastern District of Michigan (the District Court) issued four search warrants for the IRS to search properties believed to house tax and accounting records for, among others, petitioners, C&G

Consultants, Trans Continental, Trans International, and Branch International. These properties were the office buildings of Messrs. Garavaglia and Rogers and the personal residence of Mr. Garavaglia. The IRS executed the search warrants and seized more than 100 storage boxes of documents contained in storage cabinets and desks and around the searched premises.[8] In total, CID inventoried more than 2,500 items, including payroll information, invoices, quarterly reports, check registers, medical files, insurance records, State tax records, personnel files, canceled checks, wage reports, and payroll registers. Many of these documents related to C&G Consultants, Trans Continental, Trans International, and Branch International.

Following the seizures, agents with CID inventoried the items seized, matched the inventories to the boxes in which they were stored, and secured those documents in a grand jury room, which was a room designated for those records. A log was kept on the grand jury room as to the individuals who had access to the room. At some point after the grand jury was convened, the records were moved to an IRS building.

---

[8]By letter dated July 14, 2008, respondent's counsel confirmed that Mr. Garavaglia's counsel received 28 boxes from respondent.

XVI. <u>Criminal Prosecution of Mr. Garavaglia</u>

    A.    <u>Grand Jury Indictment</u>

Following CID's investigation, a Federal grand jury in the District Court returned a 19-count indictment against Mr. Garavaglia on April 10, 1996 (indictment). The indictment charged Mr. Garavaglia with mail fraud in violation of 18 U.S.C. sec. 1341, conspiracy to defraud the United States in violation of 18 U.S.C. sec. 371, making and subscribing false individual and corporate income tax returns in violation of section 7206(1), and willful failure to file heavy vehicle use tax forms in violation of section 7203. The indictment also charged that Mr. Garavaglia's fraudulent activities began in the latter part of 1988 and continued until April 1992.

    B.    <u>Plea Agreement</u>

Mr. Garavaglia subsequently entered into a plea agreement (plea agreement) with the U.S. Attorney for the Eastern District of Michigan on or about January 29, 1997. See Fed. R. Crim. P. 11(c). Mr. Garavaglia pleaded guilty to one count of mail fraud for a fraudulent check mailed on June 28, 1991, and one count of conspiracy to defraud the United States Government by filing a false corporate income tax return for Branch International on or about March 31, 1992.[9]

---

[9]The plea agreement references B.I.S., which, from the context of the discussions, we understand to be Branch

(continued...)

In the plea agreement, Mr. Garavaglia stipulated that he knowingly participated in a scheme to defraud insurance companies by obtaining workers' compensation insurance for Branch International's employees using false information reported to the insurance companies concerning the amount of payroll per classification that Branch International expected to pay its employees, thus significantly reducing the premiums for Branch International. Mr. Garavaglia also stipulated that he and several of his business associates agreed to defraud the IRS by falsely claiming substantially higher deductions for expenses than actually paid to the insurance companies on income tax returns for his employee leasing businesses, thus falsely reducing the tax liabilities of those businesses. Mr. Garavaglia also stipulated that the agreement continued through April 1992 and that on or about March 31, 1992, he signed a false corporate income tax return for Branch International. Mr. Garavaglia also agreed that the "tax loss" resulting from the charged tax offenses might be at least $207,000, an amount which he agreed to pay as restitution before sentencing.

C.   Sentencing Hearings

Between September 17, 1997, and April 9, 1988, the District Court held sentencing hearings for Mr. Garavaglia. See United

---

[9](...continued)
International.

States v. Garavaglia, 178 F.3d 1297 (6th Cir. 1999). At the sentencing hearing on September 17, 1997, Mr. Garavaglia's attorney argued that Mr. Rogers and certain members of the Yarnell family were primarily responsible for any criminal violations and that the criminal enterprise had begun before Mr. Garavaglia was involved in the scheme.

D.   Plea Hearing

The District Court conducted a thorough plea colloquy under rule 11 of the Federal Rules of Criminal Procedure. On April 15, 1998, Mr. Garavaglia was sentenced to a prison term of 27 months and placed on supervised release upon release from prison. The District Court ordered Mr. Garavaglia to pay $500,000 in restitution equally to three insurance companies, at least $207,000 to the IRS, $50,000 in fines, and an assessment of $100.

XVII. Mr. Rogers' Guilty Plea to Income Tax Fraud

Mr. Rogers was indicted along with Mr. Garavaglia. On March 25, 1996, Mr. Rogers pleaded guilty to one count of willfully making a false Federal income tax return for 1989. See sec. 7206(1). As a condition of that plea agreement, Mr. Rogers filed Forms 1040X, Amended U.S. Individual Income Tax Return, for the 1988, 1989, and 1990 taxable years (1988 through 1990 amended returns, respectively). The 1988 amended return added $11,000 of previously omitted income from Trans Continental. The 1989 and 1990 amended returns added $102,000 and $12,000 of previously

omitted income from Trans International, respectively. On the basis of his amended 1988, 1989, and 1990 Federal income tax returns, Mr. Rogers' Federal income tax liabilities increased by $3,075, $33,660, and $3,960, respectively. Mr. Rogers was also required to pay a fine of approximately $10,000 to the IRS.

XVIII. Destruction of the Seized Records

After Mr. Garavaglia and Mr. Rogers entered their respective guilty pleas, one of CID's special agents contacted Mr. Rogers. He asked whether Mr. Rogers wanted the documents from Trans International returned to him, to which Mr. Rogers replied that the documents should be "[burned]".

Mr. Garavaglia brought a claim against CID's special agents under the Supreme Court's decision in Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971). That cause of action alleged that CID's special agents coerced or encouraged Mr. L. Yarnell to obtain Branch International's tax documents under the pretense of preparing an amended Federal tax return for Branch International. See Garavaglia v. Budde, 43 F.3d 1472 (6th Cir. 1994). Mr. Garavaglia further alleged that the detention of Mr. Garavaglia, Mr. Rogers, and Mr. Garavaglia's daughter during CID's execution of the search warrants was unconstitutional. See id. The District Court summarily dismissed Mr. Garavaglia's cause of action in favor of CID's special agents, and the U.S. Court of Appeals for the Sixth Circuit affirmed. See id.

XIX. Notices of Deficiency

    A.    Mr. Garavaglia's Notice of Deficiency

By notice of deficiency dated October 31, 2006, respondent determined deficiencies in Mr. Garavaglia's 1989 and 1990 Federal income taxes of $97,070 and $114,435, respectively, and fraud penalties under section 6663(a) of $72,803 and $85,826, respectively. The deficiencies arose from three adjustments. First, respondent determined that Mr. Garavaglia received wages from C&G Consultants of $106,709 and $208,738 in 1989 and 1990, respectively. Second, respondent determined that Mr. Garavaglia's distributable shares of income and/or loss from C&G Consultants for 1989 and 1990 were increased by $220,160 and $177,586, respectively, to reflect payments from Trans and Branch International to C&G Consultants. Third, respondent determined computational adjustments of $1,440 and $3,220 in Mr. Garavaglia's 1989 and 1990 Federal income taxes, respectively.

With respect to the second adjustment, respondent determined adjustments to C&G Consultants' 1989 and 1990 distributable shares of income as follows:

| Adjustments to ordinary, distributable net, or taxable income | 1989 | 1990 |
|---|---|---|
| Gross sales or receipts-- Trans International | $159,323 | -0- |
| Gross sales or receipts-- Branch International | 71,645 | $309,380 |
| Compensation of officers | (106,709) | (208,738) |
| Other expenses | 95,901 | 76,944 |

```
Total adjustments to
ordinary, distributable
net, or taxable income          220,160      177,586
```

### 1. Gross Sales or Receipts From Trans International

Respondent first determined that C&G Consultants' distributable share of income for 1989 should be increased by $159,323 to reflect income paid from Trans International to C&G Consultants. The proposed adjustment to C&G Consultants' distributable share of income arises from Trans International's payment to C&G Consultants of consulting fees of $60,233 and accrued workers' compensation expenses of $99,090.

### 2. Gross Sales or Receipts From Branch International

Respondent next determined that C&G Consultants' distributable shares of income for 1989 and 1990 should be increased by $71,645 and $309,380, respectively, on account of income paid to C&G Consultants by Branch International.

### 3. Compensation of Officers

Respondent further determined that C&G Consultants' distributable shares of income for 1989 and 1990 should be reduced by $106,709 and $208,738. Respondent asserts that to the extent that we determine that Mr. Garavaglia received wages or officer's compensation from C&G Consultants, then C&G Consultants is entitled to deductions for like amounts.

### 4. Other Expenses

#### a. 1989

C&G Consultants deducted and respondent disallowed expenses on the 1989 C&G Consultants return as follows:

| Expense | Amount claimed on return | Amount allowed by IRS | Amount disallowed |
|---|---|---|---|
| Repairs | $4,120 | -0- | $4,120 |
| Rents | 5,400 | -0- | 5,400 |
| Taxes | 3,398 | -0- | 3,398 |
| Depreciation | 7,610 | -0- | 7,610 |
| Advertising | 2,494 | -0- | 2,494 |
| Accounting | 27,000 | -0- | 27,000 |
| Auto | 12,148 | -0- | 12,148 |
| Bank charges | 310 | $148 | 162 |
| Dues and subscriptions | 160 | 59 | 101 |
| Insurance | 4,860 | -0- | 4,860 |
| Legal | 3,168 | -0- | 3,168 |
| Miscellaneous | 2,704 | -0- | 2,704 |
| Outside services | 2,595 | -0- | 2,595 |
| Postage | 240 | -0- | 240 |
| Supplies | 3,330 | 6 | 3,324 |
| Telephone | 2,382 | 420 | 1,962 |
| Travel | 11,191 | -0- | 11,191 |
| Utilities | 3,423 | -0- | 3,423 |
| Total[1] | 96,533 | 632 | 95,901 |

[1]The sum of the items may not equal the total on account of rounding.

#### b. 1990

C&G Consultants deducted and respondent disallowed expenses on the 1990 C&G Consultants return as follows:

| Expense | Amount claimed on return | Amount allowed by IRS | Amount disallowed |
|---|---|---|---|
| Taxes | $3,395 | -0- | $3,395 |
| Depreciation | 13,649 | -0- | 13,649 |
| Advertising | 510 | -0- | 510 |

| | | | |
|---|---|---|---|
| Accounting | 2,400 | -0- | 2,400 |
| Auto | 9,914 | $760 | 9,154 |
| Bank charges | 322 | -0- | 322 |
| Dues and subscriptions | 186 | -0- | 186 |
| Gifts | 165 | -0- | 165 |
| Insurance | 16,056 | -0- | 16,056 |
| Legal | 3,925 | -0- | 3,925 |
| Office expense | 627 | 36 | 591 |
| Outside services | 6,710 | -0- | 6,710 |
| Postage | 328 | -0- | 328 |
| Supplies | 4,344 | -0- | 4,344 |
| Telephone | 2,580 | 91 | 2,489 |
| Travel | 10,053 | -0- | 10,053 |
| Utilities | 1,541 | -0- | 1,541 |
| Arbitration Fee | 1,125 | -0- | 1,125 |
| Total[1] | 77,830 | 886 | 76,944 |

[1]The total amount allowed by the IRS may not equal the sum of the items on account of rounding.

B.   Ms. Garavaglia's Notice of Deficiency

By notice of deficiency dated May 22, 2009, respondent determined deficiencies in Ms. Garavaglia's 1989 and 1990 Federal income taxes of $99,179 and $117,557 and accuracy-related penalties under section 6662(a) of $19,836 and $23,511, respectively.  Respondent determined income tax deficiencies of $99,179 and $117,557 and accuracy-related penalties under section 6662(a) of $19,836 and $23,511, respectively.  Most of the deficiencies arose from the adjustments determined with respect to Mr. Garavaglia.

C.   Differences in Notices of Deficiency

The differences between the notices of deficiency issued to Mr. Garavaglia and to Ms. Garavaglia are:  (1) The notice of

deficiency issued to Ms. Garavaglia increased C&G Consultants'
1989 share of distributable income from Trans International by
$166,865, whereas the notice of deficiency issued to Mr.
Garavaglia increased C&G Consultants' 1989 share of distributable
income from Trans International by $159,323; (2) the notice of
deficiency issued to Ms. Garavaglia increased C&G Consultants'
1990 share of distributable income from Branch International by
$320,530, whereas the notice of deficiency issued to Mr.
Garavaglia increased C&G Consultants' distributable share of
income from Branch International by $309,380; and (3) the notice
of deficiency issued to Ms. Garavaglia determined accuracy-
related penalties under section 6662(a), whereas the notice of
deficiency issued to Mr. Garavaglia determined fraud penalties
under section 6663(a).

## XX.  Trial

A trial in these cases was held in Detroit, Michigan.  The
evidence consists of the uncontested pleadings, the trial
testimony of 13 fact witnesses, approximately 300 stipulated
facts, and almost 300 stipulated exhibits.

OPINION

## I.  Perception of Witnesses

Our resolution of these cases depends, in part, on whether
we believe that Mr. Garavaglia was uncorrupted amidst a sea of
fraud.  During the course of the trial, we heard the testimony

and observed the demeanor of 13 fact witnesses, including the Garavaglias.  We observe the truthfulness, sincerity, and demeanor of each witness to evaluate his or her testimony.  We then assign weight to that testimony for the primary purpose of finding disputed facts based on the record as a whole.  HIE Holdings, Inc. v. Commissioner, T.C. Memo. 2009-130.  In the light of that testimony, we weigh the evidence, make appropriate inferences, and find what we believe to be the truth.  Kropp v. Commissioner, T.C. Memo. 2000-148.  We are "careful to avoid making the courtroom a haven for the skillful liar or a quagmire in which the honest litigant is swallowed up."  Diaz v. Commissioner, 58 T.C. 560, 564 (1972); Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995).

We generally found the testimony of Mr. Garavaglia to be self-serving, evasive, conflicted, and at times improbable.  We found material aspects of Ms. Garavaglia's testimony to be implausible.  We found the testimony of Messrs. Rogers, D. Yarnell, T. Yarnell, and Cheri Ghent Koehn (Ms. Koehn) to be generally straightforward and corroborated by the documentary evidence.  The testimony of the remaining seven witnesses was credible but mostly unhelpful in resolving issues of material

fact.[10]  To the extent that we have disregarded or discounted any testimony in these cases, we did so because we perceived the witness offering that testimony to be untrustworthy in giving that testimony or considered the testimony to be self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary or other reliable evidence.[11]  We need not accept uncontroverted testimony where we find that testimony improbable, unreasonable, or questionable.  See Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. in part and remanding in part 99 T.C. 370 (1992) and T.C. Memo. 1992-616.

II.  Status of Trans International and Branch International as S Corporations

Pursuant to section 6214(a) and Rule 41(a), respondent amended the answer to assert that Trans International and Branch International were S corporations in 1989 and 1990.[12]  Proceeding along this line, respondent argues in the main that Mr.

---

[10]These witnesses include Marie Wilhelm, Charles Gottlieb, James Budde, Suzanne M. Carene, Sarah Stinson, Alexandra Nicholaides, and Joseph Ellery.

[11]Nor do we rely heavily on the transcripts of testimony given by various witnesses in prior proceedings which were included in the record and stipulated by the parties.  Because we were not able to observe those witnesses during that testimony, we decline to accept that prior testimony merely on the basis of the written words.  We have, however, given that testimony proper regard in finding the facts of these cases and do not simply reject that testimony entirely.

[12]Respondent concedes on brief that Branch International was not an S corporation in 1990.

Garavaglia omitted distributable income in 1989 from Trans International and Branch International of $124,383 and $104,535, respectively. Respondent bears the burden of proof with respect to these newly pleaded matters. See Rule 142(b).

A. Compliance With Section 1362

Section 1362(a) provides that a "small business corporation" may elect to be taxed as a passthrough entity under subchapter S of the Code. The term "small business corporation" generally means an eligible domestic corporation with one class of stock and 35 or fewer shareholders, all of whom are resident individuals or qualified estates and trusts. Sec. 1361(b). A small business corporation makes an election to be taxed under subchapter S of the Code (S election) by filing with the IRS a completed Form 2553. Sec. 1.1362-6(a)(2), Income Tax Regs. Before an S election is valid, all shareholders as of the date the election is made must consent to that election. Sec. 1362(a)(2). A shareholder consents to an S election by signing and dating the Form 2553 submitted by the S corporation, see sec. 1.1362-6(b)(3)(i), Income Tax Regs., or by separately submitting to the IRS a signed consent statement which sets forth certain information, see sec. 1.1362-6(b)(1), Income Tax Regs.[13]

---

[13]The consent statement must set forth the name, address, and taxpayer identification number of the shareholder, the number of shares of stock owned by the shareholder, the date or dates on which the stock was acquired, the date on which the shareholder's
(continued...)

### 1.   Trans International

There is no question that Messrs. Garavaglia and Rogers intended for Trans International be taxed as an S corporation in 1989 and 1990.  Consistent with that intent, Trans International filed with respondent Form 2553 and the 1989 and 1990 Trans International returns on Forms 1120S.  Respondent, however, determined that Trans International's attempted S election was defective, and respondent stated as much by letter dated June 14, 1989.  The record does not contain a copy of a properly executed Form 2553, and in the absence of such evidence, we presume that none existed.  See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  Trans International's S election was thus invalid.

### 2.   Branch International

There is similarly no question that Messrs. Garavaglia and L. Yarnell intended for Branch International be taxed as an S corporation in 1989.  The corporate minute book and a statement of organizational resolutions for Branch International each evince a clear intent that Branch International be taxed as an S corporation.  True to that intent, Branch International filed with respondent Form 2553 and the 1989 Branch International

---

[13](...continued)
taxable year ends, the corporation's name, the corporation's taxpayer identification number, and the election to which the shareholder consents.  See sec. 1.1362-6(b)(1), Income Tax Regs.

return on Form 1120S.  Respondent, however, determined that Branch International's attempted S election was defective and revoked that election by letter dated April 23, 1990.  Thus, Branch International's S election was not valid.

B.    Judicial Doctrines

Despite separate letters to Trans International and Branch International rejecting or denying their S elections, respondent urges the Court to apply judicial doctrines to overcome their failure to comply with the requirements of section 1.1362-6(b)(3)(i), Income Tax Regs.  Respondent asserts that Trans International and Branch International ignore their form in disavowing their S corporation status and that the duty of consistency estops petitioners from denying the S corporation status of Trans International and Branch International.  Petitioners counter that neither Trans International nor Branch International was an S corporation because the S elections which they attempted to file with respondent were rejected.

1.    Form of Trans and Branch International

As a general rule, taxpayers are bound by the form of the transaction they have chosen, and they may not in hindsight recast that transaction to obtain tax advantages.  See Maloof v. Commissioner, 456 F.3d 645, 651 (6th Cir. 2006) (quoting Harris v. United States, 902 F.2d 439, 443 (5th Cir. 1990)), affg. T.C. Memo. 2005-75.  To determine the form of the transaction, we

examine the parties' intentions when the transaction was entered into and the economic realities as then perceived by the parties. See Groetzinger v. Commissioner, 87 T.C. 533, 542 (1986).

There is no question that Mr. Garavaglia manifested the requisite intent for Trans International and Branch International to be treated as S corporations, but the question is whether the law gives effect to that intent.  It does not.  Section 1362(a)(2) provides that an initial election to become an S corporation is valid "only if all persons who are shareholders * * * on the day on which such election is made consent to such election."  Sec. 1362(a)(2).  Courts have strictly construed the requirements for electing to be taxed as an S corporation.  See, e.g., Brutsche v. Commissioner, 585 F.2d 436, 443 (10th Cir. 1978) (shareholders were not individually liable for deficiency because Form 2553 did not comply with the requirements for S corporation status), remanding 65 T.C. 1034 (1976); Feldman v. Commissioner, 47 T.C. 329, 334 (1966) ("where Congress has specifically set out the procedure that must be followed in order for a corporation to obtain the benefits of subchapter S, and the corporation does not follow such procedure, the courts cannot supply what the taxpayer has failed to do").

Trans International filed a Form 2553 consent statement which reported that Mr. D. Yarnell was the sole shareholder of that company.  However, Mr. D. Yarnell was not the sole

shareholder of Trans International; Messrs. Garavaglia and Rogers were equal shareholders of that company. Similarly, Branch International filed a Form 2553 consent statement which reported that Messrs. Garavaglia and T. Yarnell were equal shareholders in that company. However, Messrs. Garavaglia and T. Yarnell were not equal shareholders in Branch International; Messrs. Garavaglia and L. Yarnell owned 70 percent and 30 percent of that company, respectively. Thus, Trans International and Branch International's S elections did not comply with the requirements of section 1.1362-6(b)(3)(i), Income Tax Regs.

### 2. The Duty of Consistency

The duty of consistency, or quasi-estoppel, is an equitable doctrine which prevents a taxpayer from benefiting in a later year from an error or omission in an earlier year which cannot be corrected because the limitations period for the earlier year has expired. Estate of Letts v. Commissioner, 109 T.C. 290, 296 (1997), affd. without published opinion 212 F.3d 600 (11th Cir. 2000). Absent a written stipulation to the contrary, an appeal in this case would lie in the Sixth Circuit. Sec. 7482(b)(1)(A).

The Court of Appeals for the Sixth Circuit has held that for the duty of consistency to apply, the following requirements must be met: (1) The taxpayer by his or her conduct knowingly makes a representation or conceals a material fact which the taxpayer intends or expects will be acted upon by the Commissioner in

determining the taxpayer's liability; (2) the true or concealed material facts are unknown to the Commissioner or the Commissioner lacks a means of knowledge equal with the taxpayer's; (3) the Commissioner relies on the taxpayer's representation or concealment; and (4) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the facts in such a way causes loss of taxes to the Government. Crosley Corp. v. United States, 229 F.2d 376, 380-381 (6th Cir. 1956); see also Temple v. Commissioner, 62 Fed. Appx. 605, 609 (6th Cir. 2003), affg. T.C. Memo. 2000-337. Where each of the foregoing requirements is met, taxpayers are estopped from asserting positions contrary to their earlier representations, and the Commissioner may treat those representations as true even though they are not. Herrington v. Commissioner, 854 F.2d 755, 758 (5th Cir. 1988), affg. Glass v. Commissioner, 87 T.C. 1087 (1986).

The requirements for applying the duty of consistency have not been met. First, petitioners did not materially misrepresent or conceal the status of Trans International and Branch International as S corporations. In 1989 each corporation filed its Form 1120S under the mistaken belief that the attempted S election was valid. Second, respondent was aware that Trans International and Branch International intended to be taxed as S corporations, but did not give effect to that intent until

amending the answer. In this regard, the status of Trans International and Branch International was one of law and not fact. The duty of consistency does not apply where the inconsistent positions asserted by the taxpayer involve questions of law arising out of a defined factual situation. See _Crosley Corp. v. United States_, _supra_ at 380. Third, respondent did not rely on the defective election made by Trans International or Branch International. The notices of deficiency issued to Mr. and Ms. Garavaglia did not treat Trans International or Branch International as an S corporation. Fourth, treating Trans International and Branch International as C corporations does not affect the period of limitations for assessment. That period is either open on account of fraud, or it is closed. The status of Trans International or Branch International as an S corporation has no bearing on this issue.

Neither the form chosen by Trans International and Branch International nor the duty of consistency usurps the failure of those companies to satisfy the strict requirements for electing subchapter S status. Trans International and Branch International attempted to elect S corporation status, and respondent properly denied that request. Respondent cannot now expect this Court to supply what petitioners have failed to do themselves, especially after declining to give effect to that intent in the first place.

III. Omitted Income

Having failed to persuade us that Trans International or Branch International was an S corporation, respondent proceeds under his alternative theory that Mr. Garavaglia omitted income of $326,815 and $386,324 in 1989 and 1990, respectively. Specifically, respondent asserts that (1) Mr. Garavaglia omitted income from C&G Consultants in 1989 and 1990 of $106,709 and $208,738, respectively; and (2) Mr. Garavaglia's shares of C&G Consultants' shares of distributive income for 1989 and 1990 are increased by $220,160 and $177,586, respectively.[14] Petitioners counter that (1) the books and records on which these determinations were based are inherently unreliable, and (2) payments between Mr. Garavaglia, C&G Consultants, Trans International, and Branch International, were nontaxable loan repayments.

A. Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayers bear the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In the context of unreported income, the Court of Appeals for the Sixth Circuit has held that before the notice of deficiency is entitled to a

---

[14]Respondent also made computational adjustments to Mr. Garavaglia's 1989 and 1990 itemized deductions of $1,440 and $3,220, respectively.

presumption of correctness, such determinations must be supported by at least a "minimal" factual predicate or foundation of substantive evidence linking the taxpayer to the income-producing activity or to the receipt of funds. See United States v. Walton, 909 F.2d 915, 918-919 (6th Cir. 1990); Richardson v. Commissioner, T.C. Memo. 2006-69, affd. 509 F.3d 736 (6th Cir. 2007). Once the Commissioner meets his burden of production, the burden of proof shifts to the taxpayers to prove that they did not earn the income attributable to them or of presenting an argument that the adjustments offered by the Commissioner are not grounded in a minimal evidentiary foundation. Richardson v. Commissioner, supra. Where taxpayers establish by a preponderance of the evidence that the Commissioner's determinations are arbitrary and excessive, then the notice of deficiency is no longer presumed correct. Helvering v. Taylor, 293 U.S. 507, 515 (1935); Traficant v. Commissioner, 884 F.2d 258, 263 (6th Cir. 1989), affg. 89 T.C. 501 (1989).

Respondent introduced admissible, substantive evidence linking Mr. Garavaglia to payments received in connection with a scheme to defraud insurance companies and the Treasury. The evidence included canceled checks and/or accounting ledgers which reflected payments between Mr. Garavaglia, C&G Consultants, Trans International, and Branch International. We are satisfied that respondent has produced evidence that Mr. Garavaglia earned the

income with which he is charged.  Thus, petitioners bear the burden of proving that respondent's determinations are arbitrary and excessive.

Although petitioners "reserve the issue" of whether the notice of deficiency issued to Mr. Garavaglia was arbitrary, we understand petitioners to advance two theories to meet their burden.  First, petitioners assert that the payments between Mr. Garavaglia, C&G Consultants, Trans International, and Branch International were loan repayments.  Second, petitioners contend that the books and records of Trans International and Branch International are inherently unreliable and cannot serve as the basis for determining income earned by Mr. Garavaglia.  For the reasons discussed below, petitioners have not met their burden.

B.    Guiding Principles

Section 61(a)(2) defines gross income as all income from whatever source derived, including gross income derived from business.  Section 61 is broad, requiring that gains from lawful and unlawful activities be included as income.  See, e.g., Rutkin v. United States, 343 U.S. 130, 137 (1952) ("An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it."); see also Davis v. United States, 226 F.2d 331, 334-335 (6th Cir. 1955).  A taxpayer has received income where he or she gains complete

dominion and control over the money or other property and realizes an economic benefit.

A taxpayer is required to maintain sufficient records to enable the Commissioner to determine his or her correct tax liability. Sec. 6001. Where a taxpayer fails to maintain adequate books and records, the Commissioner is empowered to determine the existence and amount of the taxpayer's income by any method that clearly reflects income. Sec. 446(b); Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989). The Commissioner's reconstruction of a taxpayer's income need only be reasonable in the light of the surrounding facts and circumstances. Parks v. Commissioner, 94 T.C. 654, 658 (1990). The Commissioner is not held to mathematical exactitude because to do so "'would be tantamount to holding that skillful concealment is an invincible barrier to proof.'" Llorente v. Commissioner, 74 T.C. 260, 266 (1980) (quoting United States v. Johnson, 319 U.S. 503, 517-518 (1943)), affd. in part and revd. in part 649 F.2d 152 (2d Cir. 1981).

Respondent determined that petitioners underreported income and overstated deductions following a criminal investigation and prosecution of Mr. Garavaglia. Respondent also determined that petitioners did not maintain books and records which accurately reflected transactions between Mr. Garavaglia, C&G Consultants, Trans International, and Branch International. We agree that

petitioners did not maintain sufficient records from which respondent could determine their tax liabilities. Accordingly, respondent is given broad power to compute petitioners' taxable income. See Petzoldt v. Commissioner, supra at 693.

C.    Distributions From C&G Consultants

Respondent determined adjustments to Mr. Garavaglia's 1989 and 1990 income of $106,709 and $208,738, respectively. To arrive at these adjustments, respondent's auditor analyzed and prepared a summary of checks endorsed by C&G Consultants to Mr. Garavaglia during 1989 and 1990. The summary designated the date, check number, payee, amount, and any notations made on the checks. Respondent attached the summary to the notice of deficiency and treated all amounts distributed from C&G Consultants to Mr. Garavaglia during 1989 and 1990 as income to Mr. Garavaglia. Respondent thoroughly corroborated that summary at trial with copies of almost all of the canceled checks on which the adjustments were based. It is well settled that a bank deposit is prima facie evidence of income where that deposit is made from or to an account controlled by the party charged with the income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Accordingly, we find respondent's method to be reasonable.

We have examined the checks presented by respondent at trial and generally agree with respondent's conclusions. In 1989 Mr. Garavaglia wrote himself more than 50 checks from C&G Consultants

totaling $104,939.[15]  In 1990 Mr. Garavaglia wrote himself 40 checks from C&G Consultants totaling $204,818.[16]  These checks were written almost weekly.  As evidenced by petitioners' financial assets of more than $1 million, Mr. Garavaglia exercised dominion and control over these funds, and he derived economic benefit from them.  Accordingly, we hold that Mr. Garavaglia had income of $104,939 and $204,818 in 1989 and 1990, respectively.

D.   Schedule E Income

During 1989 and 1990 Mr. Garavaglia operated as a labor consultant through C&G Consultants.  C&G Consultants reported

---

[15]Whereas respondent's auditor determined that Mr. Garavaglia received $106,709 in payments from C&G Consultants, we limit the amount of income paid to Mr. Garavaglia to $104,939. The difference between the amount determined by respondent and that determined by the Court resulted because respondent's auditor included as income check Nos. 1236, 1238, and 1239, each of which was purportedly in the amount of $2,520, for a total of $7,560.  The checks respondent submitted, however, did not include check No. 1236, 1238, or 1239.  Instead, respondent submitted at trial check No. 1223 in the amount of $5,790.  The difference between these amounts is $1,770 ($7,560 less $5,790), which is also the difference between the amount determined by respondent ($106,709) and the amount determined by the Court ($104,939).

[16]Whereas respondent's auditor determined that Mr. Garavaglia received $208,738 in payments from C&G Consultants, we limit the amount of income paid to Mr. Garavaglia to $204,818. The difference between the amount determined by respondent and that determined by the Court resulted because respondent's auditor included as income (1) $2,520 apparently paid on check No. 1256, and (2) $1,400 designated as "CC".  The records respondent submitted did not include check No. 1256 or otherwise clarify what the payment "CC" related to.  Accordingly, we reduce the income as determined by respondent by $3,920.

gross receipts of $50,000 on each of the 1989 and 1990 returns, amounts which were paid pursuant to an independent contractor agreement with Central. The 1989 and 1990 C&G Consultants returns, however, did not report as gross receipts or sales income from Trans International or Branch International, even though those companies made regular and sizable payments to C&G Consultants.

Respondent determined adjustments of $220,160 and $177,586 to Mr. Garavaglia's 1989 and 1990 distributable shares of income, respectively. Specifically, respondent determined adjustments to C&G Consultants' 1989 and 1990 returns as follows: (1) An increase of $159,323 from Trans International's 1989 gross sales or receipts; (2) increases of $71,645 and $309,380 from Branch International's 1989 and 1990 gross sales or receipts, respectively; (3) decreases of $106,709 and $208,738 for officer's compensation; and (4) increases of $95,901 and $76,944 for other expenses. We consider each adjustment in turn.

### 1. Gross Sales or Receipts From Trans International

Respondent determined an adjustment to C&G Consultants' 1989 gross receipts or sales from Trans International of $159,323. This adjustment was figured from Trans International's general ledger because canceled checks between Trans International and C&G Consultants were unavailable. Given the circumstances of this case, we find respondent's method for calculating payments

between Trans International and C&G Consultants to be reasonable. See sec. 446(b).

We have confirmed the accuracy of respondent's analysis and found that Trans International's general ledger recorded that C&G Consultants was paid (1) $60,233 of consulting fees, and (2) $99,090 of premiums collected from Trans International's client companies and distributed to C&G Consultants. Mr. Garavaglia does not dispute that C&G Consultants received these payments and we treat them as income to C&G Consultants. Accordingly, we hold that C&G Consultants' 1989 gross receipts or sales are increased by $159,323.

2. Gross Sales or Receipts From Branch International

Respondent also determined adjustments to C&G Consultants' gross receipts or sales from Branch International in 1989 and 1990 of $71,645 and $309,380, respectively. To compute these adjustments, respondent's auditor analyzed canceled checks between Branch International and C&G Consultants. Respondent treated all payments from Branch International to C&G Consultants as income to C&G Consultants. He also corroborated the proposed adjustments at trial by submitting copies of most of the checks on which the adjustments were based.

We have verified respondent's analysis and generally agree with his determinations. In 1989 Branch International endorsed 39 separate checks to C&G Consultants totaling $71,645. In 1990

Branch International endorsed 98 separate checks to C&G Consultants totaling $329,805. These payments were routinely made, and Mr. Garavaglia does not dispute that C&G Consultants received these payments. Although the record reflects that Branch International paid C&G Consultants $329,805, we limit the amount of the deficiency to the amounts respondent determined. Consequently, we hold that C&G Consultants' gross receipts or sales from Branch International in 1989 and 1990 are increased by $71,645 and $309,385, respectively.

### 3. Compensation of Officers

Respondent determined that C&G Consultants was entitled to deductions for officers compensation in 1989 and 1990 of $106,709 and $208,738, respectively. Respondent's opening brief is consistent with this position in that respondent asserts that C&G Consultants is entitled to a deduction in an amount equal to the distributions that C&G Consultants made to Mr. Garavaglia. Section 162(a)(1) allows as a deduction all the ordinary and necessary expenses of a business, including a reasonable allowance for salaries or other compensation for personal services actually rendered.[17] We have determined that Mr. Garavaglia received from C&G Consultants income of $104,939 and $204,818 during 1989 and 1990, respectively. These amounts were

---

[17]Respondent does not assert that the compensation is not reasonable. See, e.g., Alpha Med., Inc. v. Commissioner, 172 F.3d 942, 945-947 (6th Cir. 1999), revg. T.C. Memo. 1997-464.

the equivalent of wages or salaries paid between C&G Consultants and Mr. Garavaglia. We thus hold that C&G Consultants is entitled to deductions for officers' compensation of $104,939 and $204,818 in 1989 and 1990, respectively.

### 4. Other Expenses

Respondent disallowed expenses of $95,901 and $76,944 which C&G Consultants claimed as deductions on its 1989 and 1990 returns. It is well settled that deductions are a matter of legislative grace, and that a taxpayer bears the burden of producing sufficient evidence to substantiate any deduction that would otherwise be allowed by the Code. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Although petitioners submitted numerous receipts showing that expenses were paid by C&G Consultants, they provided no explanation that those expenses were ordinary and necessary to C&G Consultants' labor consulting trade or business. See sec. 162(a). Accordingly, we sustain respondent's determination that C&G Consultants may not deduct other expenses of $95,901 and $77,830 in 1989 and 1990, respectively.

### F. Petitioners' Contentions

### 1. Reliability of Books and Records

Petitioners contend that members of the Yarnell family are "master embezzlers" who manipulated the books and records of Trans International and Branch International such that the books

and records of those companies are unreliable. According to petitioners, members of the Yarnell family "throw around journal entries like they are trinkets at Mardi Gras". Petitioners seek to muddy the waters in an obvious attempt to divert the Court's attention from their own wrongdoing. We are not persuaded.

Petitioners refer the Court to minor flaws in the books and records of Branch International as proof that members of the Yarnell family could have written checks to themselves that did not appear on the books and records of Trans International and Branch International. We decline to treat the books of Trans and Branch International as unreliable simply to reflect the possibility of fabrication. As the Supreme Court stated in United States v. Biceglia, 420 U.S. 141, 145 (1975): "our tax structure is based on a system of self-reporting. There is legal compulsion, to be sure, but basically the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability."

Nor are we persuaded by petitioners' attempts to cast doubt on Mr. Garavaglia's liability under the pretense that members of the Yarnell family were "master embezzlers". As early as December 1, 1990, Mr. Garavaglia was aware that Mr. L. Yarnell and his wife "received double payment of remuneration" of $9,000. According to the corporate records of Branch International Mr. Garavaglia and Mr. L. Yarnell agreed that Mr. L. Yarnell would

repay these amounts. Moreover, Mr. Garavaglia was vice president of security at Central from 1975 through part of 1986. We doubt that Mr. Garavaglia would not have recognized the claimed embezzlement by members of the Yarnell family especially given that he recognized an overpayment as small as $9,000.

The books and records of Trans International and Branch International show in detail the transfers to C&G Consultants, Sentury, LTD Accounting, or members of the Yarnell family. Many of the entries in these books and records are corroborated by canceled checks between the respective entities. We lend greater weight to this documentary evidence than to Mr. Garavaglia's self-serving testimony.

## 2. Purported Loans

Petitioners assert that distributions between Mr. Garavaglia, C&G Consultants, Trans International, and Branch International were nontaxable loan repayments. Specifically, petitioners assert that C&G Consultants lent (1) $75,000 and $117,000 to Trans International in 1988 and 1989, respectively, and (2) $70,000 to Branch International in 1989.[18] Petitioners

---

[18]Mr. and Ms. Garavaglia's briefs are inconsistent in the amounts which they claim was lent to Trans International. In particular, Ms. Garavaglia contends that C&G Consultants made two additional loans not considered by Mr. Garavaglia. We reject Ms. Garavaglia's claim that these loans were made, for the reasons stated elsewhere in this opinion.

bear the burden of proving that the transferred funds were loan repayments.  See Rule 142(a).

For a bona fide loan to exist, the parties to the loan must have intended to establish a debtor-creditor relationship when the funds were advanced.  Berthold v. Commissioner, 404 F.2d 119, 122 (6th Cir. 1968), affg. T.C. Memo. 1967-102; Haag v. Commissioner, 88 T.C. 604, 615-617 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).  Loans between related parties, such as a shareholder and a closely held corporation, are subject to particular scrutiny "because the control element suggests the opportunity to contrive a fictional debt."  United States v. Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976) (quoting Cuyuna Realty Co. v. United States, 180 Ct. Cl. 879, 382 F.2d 298, 300-301 (1967)).  Because the intentions of parties to a loan are often unclear, courts rely upon objective factors to distinguish between loans and disguised dividends.  These factors include:  (1) Whether the promise to repay is evidenced by a note or other instrument; (2) whether adequate interest was charged; (3) whether a fixed repayment schedule was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the

transaction was a loan.  See <u>Dietrick v. Commissioner</u>, 881 F.2d 336, 340 (6th Cir. 1989), affd. T.C. Memo. 1988-180.

To meet their burden, petitioners rely upon Mr. Garavaglia's testimony and at least six loan agreements between Mr. Garavaglia, C&G Consultants, Trans International, or Branch International.[19]  We reject petitioners' characterization of the distributions as loan repayments.  First, petitioners submitted notes which purport to be loan agreements between C&G Consultants, Trans International, and Branch International.  However, this evidence was seriously undermined by the testimony of Messrs. Rogers and L. Yarnell and Ms. Koehn.  Mr. Rogers testified that he and Mr. Garavaglia met to execute loan documents after CID executed its search warrants.  Mr. Rogers also testified that he was unaware that Mr. Garavaglia made any loans to Trans International and that he would have known if such loans had been made because Mr. Rogers controlled Trans International's bank accounts.  Mr. L. Yarnell and Ms. Koehn each

---

[19]Petitioners also present seven letters or loan documents which state that between Mar. 15, 1986, and Sept. 10, 1989, Mr. Garavaglia lent $231,000 to C&G Consultants.  Two of these purported loan documents are marked "Paid" as of Dec. 29, 1988. One claimed loan document is an unsigned page of an agreement which may or may not be a loan agreement.  The four remaining loan documents do not prescribe a stated rate of interest, the posting of collateral, or a fixed repayment schedule.  We conclude that none of these six documents memorialized a bona fide loan.

identified documents which purport to bear their signature but which they did not in fact sign.

Second, petitioners claim that distributions which they received from Trans International in the form of consulting fees were actually loan repayments from Trans International to C&G Consultants. However, Trans International deducted these consulting fees as expenses on the 1989 Trans International return. We doubt that Trans International would have deducted loan repayments as consulting fees given that Trans International's general ledger also treated these payments as consulting fees.

Third, Branch International's books and records do not reflect loan repayments in the amounts offered by petitioners. Branch International maintained an account titled "Note Payable-- C&G Consultants" (note payable account). If Branch International regarded those distributions as loan repayments, one might expect that Branch International would have recorded these transactions in its note payable account. For example, Mr. Garavaglia contends that he lent Branch International $30,000 for startup costs in May 1989. Yet Branch International's books and records credited the note payable account only $8,310. This loan was repaid by check on October 19, 1988, and was accounted for as a loan in the calculations of respondent's auditor. The distributions which petitioners claim are loan repayments were

not debited to the note payable account.  Instead, these distributions were charged to the consulting fees and/or premium expense account.

Fourth, distributions from Trans International to C&G Consultants and Sentury were generally proportionate to the ownership interest of Messrs. Garavaglia and Rogers.  Similarly, distributions from Branch International to C&G Consultants and LTD Accounting or members of the Yarnell family were generally in proportion to the ownership interests of Mr. Garavaglia and Mr. L. Yarnell.  Respondent contends, and we agree, that the distributions between C&G Consultants, Trans International, and Branch International represented Mr. Garavaglia's share of the proceeds from perpetrating a fraud upon the insurance companies.

The evidence as a whole makes suspect Mr. Garavaglia's claim that he lent money to C&G Consultants, Trans International, and Branch International.  He is faced with the contradictory testimony of three witnesses who allege that he falsified documents and never made the loans which he claims to have made. We decline to credit Mr. Garavaglia's testimony given the consistent testimony of three witnesses and the strong proof of fraud against him.  See, e.g., Frierdich v. Commissioner, 925 F.2d 180, 185-186 (7th Cir. 1991) (treating a taxpayer's explanation of the existence of a loan as plausible but

insufficient to establish a bona fide debt), affg. T.C. Memo. 1989-103 as amended by T.C. Memo. 1989-393.

IV.  Fraud Penalty

Section 6663(a) imposes a 75-percent penalty on the portion of any underpayment of tax attributable to fraud.  Section 6663(b) provides that where the Commissioner establishes that any portion of an underpayment of tax is attributable to fraud, the entire underpayment is treated as attributable to fraud except with respect to the portion of the underpayment that the taxpayer establishes, by a preponderance of the evidence, is not attributable to fraud.  Section 6663(c) specifies that in the case of a joint return, the 75-percent penalty imposed by section 6663(a) does not apply to a spouse unless some part of the underpayment is attributable to the fraud of that spouse.

The Commissioner bears the burden of establishing fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  Clear and convincing evidence is:

> "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal." * * *

Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 516 (1990) (quoting Cross v. Ledford, 120 N.E.2d 118, 123 (Ohio 1954)); see also Hobson v. Eaton, 399 F.2d 781, 784 n.2 (6th Cir. 1968).  To

carry his burden, the Commissioner must prove for each year in which fraud is alleged that (1) an underpayment of tax existed, and (2) a portion of the underpayment is attributable to fraud. Petzoldt v. Commissioner, 92 T.C. at 698.

A.    Underpayment of Tax

The Commissioner may satisfy his burden of proving an underpayment of tax attributable to unreported income in either of two ways:  (1) By proving a likely source of the unreported income; or (2) by disproving any alleged nontaxable source of that income.  DiLeo v. Commissioner, 96 T.C. 858, 873-874 (1991), affd. 959 F.2d 16 (2d Cir. 1992).  Respondent has proven by clear and convincing evidence that Mr. Garavaglia earned unreported income of more than $850,000 by virtue of income received from C&G Consultants and an increase in C&G Consultants' distributable share of income from Trans International and Branch International.  We thus find that respondent has clearly and convincingly satisfied the first element of section 6663(a).

B.    Fraudulent Intent

Whether a portion of the underpayment of tax is attributable to fraud is a question of fact to be resolved on the basis of the record as a whole.  Parks v. Commissioner, 94 T.C. at 660.  Fraud is defined as the intentional commission of an act or acts for the specific purpose of evading tax believed to be owing. Petzoldt v. Commissioner, supra at 698.  Fraud implies bad faith,

intential wrong doing and a sinister motive. Davis v. Commissioner, 184 F.2d 86, 87 (10th Cir. 1950), remanding a Memorandum Opinion of this Court. Fraud is never imputed or presumed but must always be established by independent evidence that establishes fraudulent intent. Petzoldt v. Commissioner, supra at 699. Because fraud is rarely admitted, alleged tax fraud may be proven by circumstantial evidence that is "so strong that no other conclusion can be reached". Biggs v. Commissioner, 440 F.2d 1, 5 (6th Cir. 1971), affg. T.C. Memo. 1968-240; see also Richardson v. Commissioner, 509 F.3d 736, 743 (6th Cir. 2007), affg. T.C. Memo. 2006-69. We may infer fraud from "any conduct, the likely effect of which would be to mislead or conceal." United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990).

Courts often rely upon certain "badges" of fraud in deciding whether a taxpayer had the requisite fraudulent intent to support a penalty under section 6663(a). These indicia of fraud include: (1) Understatements of income, (2) destruction of records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failure to cooperate with tax authorities, (6) participation in illegal activities, (7) the credibility of the taxpayer's testimony, (8) filing false documents, (9) failure to file accurate tax returns, (10) failing to furnish the Government with access to the taxpayer's records,

and (11) intention to mislead which may be inferred from a pattern of activity. See <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Solomon v. Commissioner</u>, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), affg. T.C. Memo. 1982-603; <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 211 (1992). Although no one factor is dispositive, the existence of several indicia is competent evidence of fraud. <u>Solomon v. Commissioner</u>, <u>supra</u> at 1461; <u>Niedringhaus v. Commissioner</u>, <u>supra</u> at 211.

1. Direct Evidence of Fraud

On or before January 31, 1990, Mr. T. Yarnell sent to Mr. Garavaglia a letter which stated that amounts due from Trans International and Branch International to the Ohio Bureau of Workman's Compensation were generally "[scaled] down" to 25 percent of the actual amounts due. Attached to that letter were schedules showing "actual" and "modified" payrolls for Trans and Branch International. This letter and the accompanying schedules serve as persuasive direct evidence that as of January 31, 1990, Mr. Garavaglia knew that Trans International and Branch International had understated their workers' compensation liability. This letter and the accompanying schedules were received by Mr. Garavaglia before the 1989 and 1990 Trans International and Branch International returns were filed, and we therefore believe that Mr. Garavaglia knew of the underreporting of premiums when

he filed the 1989 Trans International and Branch International returns. This factor favors a finding of fraudulent intent.

### 2. Understatement of Income

A pattern of consistently and substantially underreporting income over several years is evidence of fraud. Holland v. United States, 348 U.S. 121, 137-139 (1954). Petitioners failed to report or account for more than $850,000 of income paid to Mr. Garavaglia or C&G Consultants over 2 years. The evidence clearly and convincingly establishes that Mr. Garavaglia underreported his taxable income for 1989 and 1990. The failure to report this income is strong evidence of fraudulent intent. See Kurnick v. Commissioner, 232 F.2d 678 (6th Cir. 1956), affg. T.C. Memo. 1955-31.

### 3. Destruction of Records

Although we look to Mr. Garavaglia's actions at the time he filed the 1989 and 1990 joint returns, we may consider his actions after the tax filings to determine his earlier state of mind. Richardson v. Commissioner, supra at 743-744. Mr. Garavaglia's behavior after CID executed its search warrants made a bad situation worse. In a telephone conversation with Mr. L. Yarnell on July 14, 1992, Mr. Garavaglia advised Mr. L. Yarnell to destroy Branch International's records, canceled checks, Forms 941, and worksheets used in the workers' compensation audits. Soliciting another to destroy books and records is indicative of

fraudulent intent to evade taxes.  See, e.g., Spies v. United States, supra at 499.

### 4.    Implausible or Inconsistent Explanations

The implausible behavior exhibited by Mr. Garavaglia began with Trans Continental in March 1989.  The auditor assigned to Trans Continental's audit in 1989 determined a shortfall in that company's premiums.  Rather than contest that deficiency or make whole the insurance company, Messrs. Garavaglia, Rogers, and L. Yarnell avoided the shortfall by forming Trans International as a parallel employee leasing company.  Trans Continental's ending balances on its books and records became Trans International's beginning balances.  Trans Continental's workers' compensation liability was thus transmitted to Trans International, and Trans International's formation was grounded in fraud by early 1989.

The implausible behavior of Mr. Garavaglia continued at Trans International and Branch International throughout 1989 and 1990.  As evidenced by the letter from Mr. T. Yarnell to Mr. Garavaglia on January 30, 1990, Trans International and Branch International scaled down their payrolls to 25 percent of actual. The actual and modified payrolls were used to bill client companies and compute the premiums payable to the insurance companies.  The differences between the amounts billed to the client companies and the amounts paid to the insurance companies were distributed to, among others, Mr. Garavaglia.

Underreporting Trans International's and Branch International's payrolls caused the premiums they owed to the insurance companies to be understated by approximately 75 percent. The understatements deprived the insurance companies of working capital and exposed them to unnecessary and unmanageable risk.

Also implausible is Mr. Garavaglia's conduct in reporting the activities of C&G Consultants, Trans International, and Branch International. The tax scheme perpetrated by Mr. Garavaglia is inextricably related to the insurance scheme. By accruing an expense larger than actually paid, Trans International and Branch International also deducted expenses greater than they paid. For book and tax purposes, these accruals were never adjusted to reflect the actual premiums paid to the insurance companies. Mr. Garavaglia therefore overstated premium deductions on the 1989 and 1990 Trans International and Branch International returns, while omitting substantial income.

Mr. Garavaglia's explanation of his behavior is similarly implausible and inconsistent. He explained at trial that he acted "in good faith" when he "low-[balled]" the insurance companies because it was common practice to do so. He explained that he expected the insurance companies to be made whole during the audit. However, he took no affirmative steps to ensure that the insurance companies were made whole, and he actively hid and

concealed his misdeeds.  We find fraudulent intent from Mr. Garavaglia's implausible behavior and inconsistent explanations.

### 5.    Concealment of Income or Assets

Fraud is evidenced by proof that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  Respondent received a tip that Mr. Garavaglia had perpetrated a fraud upon insurance companies and the Treasury from a confidential informant.  That tip was corroborated by members of the Yarnell family, who explained the nuances of Mr. Garavaglia's fraudulent activities.  CID executed search warrants and conducted telephone surveillance of Mr. Garavaglia to learn the details of Mr. Garavaglia's elaborate fraud.  When Mr. Garavaglia learned that CID had implicated him in illegal activity, he went to great efforts to conceal and mislead the Government about his misdeeds.  At no time was Mr. Garavaglia honest or straightforward about his wrongdoing.  This factor suggests fraudulent intent.

### 6.    Failure To Cooperate With Tax Authorities

The failure to cooperate with tax authorities demonstrates fraudulent intent.  See Powell v. Granquist, 252 F.2d 56, 61 (9th Cir. 1958).  Mr. Garavaglia's interaction with CID and opposing counsel was evasive and devious.  He encouraged Mr. L. Yarnell to destroy records before CID could access them.  At trial Mr.

Garavaglia evaded simple and direct questions from respondent's counsel.  This factor favors a finding of fraudulent intent.

### 7.    Participation in Illegal Activities

Mr. Garavaglia pleaded guilty to and was convicted of one count of mail fraud for a fraudulent check mailed on June 28, 1991, and one count of conspiracy to defraud the United States Government by filing a false corporate income tax return for Branch International in violation of section 7206(1).  Although that conviction does not collaterally estop Mr. Garavaglia from denying that he fraudulently understated petitioners' income tax liabilities, that conviction is a probative fact that may be considered persuasive evidence of fraudulent intent.  Wright v. Commissioner, 84 T.C. 636, 643-644 (1985).

Upon entering his guilty plea, Mr. Garavaglia stipulated that he knowingly participated in a scheme to defraud insurance companies through Branch International.  He also stipulated that he and several of his business associates agreed to defraud the IRS by claiming deductions in excess of the expenses actually paid.  He also agreed that the "tax loss" resulting from the charged tax offenses might be at least $207,000, an amount which he agreed to pay as restitution before sentencing.  Mr. Garavaglia's illegal activities indicate fraudulent intent.

### 8. Failure To File Accurate Tax Returns

Fraudulent intent may be inferred where a taxpayer files a return intending to conceal, mislead, or otherwise prevent the collection of tax. Spies v. United States, 317 U.S. at 499. Almost all tax filings undertaken by Mr. Garavaglia, C&G Consultants, Trans International, and Branch International were improperly filed. The 1989 and 1990 joint returns understated income earned by Mr. Garavaglia from C&G Consultants. Trans International's Form 2553 reported Mr. D. Yarnell as the sole shareholder of that company, even though he was not. Branch International's Form 2553 reported Mr. T. Yarnell as that company's shareholder, even though he was not a shareholder at all. The 1989 and 1990 Trans International returns and the 1989 Branch International return were filed on Forms 1120S, even though these companies had not made valid elections to be taxed as S corporations. This factor favors a finding of fraud.

### C. Effect of Fraud

After our review of the record as a whole in the light of the foregoing factors, we are convinced that portions of the underpayments of tax on the 1989 and 1990 joint returns were attributable to Mr. Garavaglia's fraud. Where the Commissioner establishes that any portion of an underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except to the extent that the taxpayer establishes

otherwise. See sec. 6663(b); Hagaman v. Commissioner, 958 F.2d 684, 696 (6th Cir. 1992), affg. and remanding T.C. Memo. 1990-655. Mr. Garavaglia has failed to establish that any portions of the underpayments were not attributable to fraud. Accordingly, we hold that Mr. Garavaglia is liable for fraud penalties in 1989 and 1990 in amounts to be determined under Rule 155.

V.    Accuracy-Related Penalty

Section 6662(a) and (b)(2) imposes a 20-percent accuracy-related penalty on that portion of an underpayment of tax due to a substantial understatement of income tax. Section 6662(b) provides that a section 6662(a) accuracy-related penalty does not apply to any portion of an underpayment of tax subject to the fraud penalty under section 6663. Where a joint return is filed and one spouse is found liable for the fraud penalty, imposing the accuracy-related penalty on the other spouse constitutes impermissible stacking. Foxworthy, Inc. v. Commissioner, T.C. Memo. 2009-203; Talmage v. Commissioner, T.C. Memo. 2008-34, affd. 391 Fed. Appx. 660 (9th Cir. 2010); Said v. Commissioner, T.C. Memo. 2003-148, affd. 112 Fed. Appx. 608 (9th Cir. 2004).

Petitioners filed joint returns for 1989 and 1990. Respondent imposed the accuracy-related penalty on Ms. Garavaglia for underpayments of tax upon which the Court found Mr. Garavaglia liable for the fraud penalty. Therefore, we find that imposing the accuracy-related penalty would result in

impermissible stacking.  Accordingly, we hold that Ms. Garavaglia is not liable for the section 6662(a) accuracy-related penalty.

## VI.   Statute of Limitations

Petitioners assert that the period of limitations on assessment has expired with respect to 1989 and 1990.  Respondent counters that the period of limitations for assessment is open on account of the fraud of Mr. Garavaglia, or alternatively, on account of the fraud of petitioners' paid return preparers.

As a general rule, the Commissioner must assess the amount of tax against an individual taxpayer within 3 years after a tax return is filed.  Sec. 6501(a) and (b)(1); Mecom v. Commissioner, 101 T.C. 374, 382 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994).  In the case of the filing of a false or fraudulent return with the intent to evade tax, however, the tax may be assessed at any time.  Sec. 6501(c)(1).  If any part of a return is determined to be the result of fraud, a taxpayer may not assert as a defense that the period of limitations has expired.  Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32.  In the case of a joint return, proof of fraudulent intent as to either joint taxpayer lifts the bar of the statute of limitations as to both taxpayers.  See Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972).  We have found that Mr. Garavaglia filed the 1989 and 1990 joint returns fraudulently with the intent to evade tax.  It

follows that the period of limitations on assessment is open as to both years as to Mr. and Ms. Garavaglia. See Colestock v. Commissioner, 102 T.C. 380, 385 (1994).

## VII. Ms. Garavaglia's Entitlement to Innocent Spouse Relief

Under section 6013(d)(3), a husband and wife filing a joint Federal income tax return are generally jointly and severally liable for all taxes determined to be owing. Ms. Garavaglia asserts that she is entitled to relief from joint and several liability under section 6015(b) and (f). Respondent argues that Ms. Garavaglia is not entitled to such relief because she knew or should have known of the income giving rise to the deficiency, and that it is equitable to hold her liable for that deficiency. Except as otherwise provided in section 6015, Ms. Garavaglia bears the burden of proving her entitlement to such relief. See Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

### A. Section 6015(b)

Ms. Garavaglia may be granted relief under section 6015(b) if the following requirements are met for each year: (A) A joint return was made, (B) on that return there is an understatement of tax attributable to erroneous items of one petitioner filing the joint tax return, (C) Ms. Garavaglia establishes that in signing the return she did not know, and did not have reason to know, that there was an understatement of tax, (D) taking into account

all of the facts and circumstances, it is inequitable to hold Ms. Garavaglia liable for the deficiency in tax for the taxable year attributable to the understatement; and (E) Ms. Garavaglia elected innocent spouse relief no later than 2 years after the date respondent began collection activities with respect to Ms. Garavaglia.  See sec. 6015(b)(1).  The requirements of section 6015(b)(1) are stated in the conjunctive, and therefore the failure to satisfy any one of the requirements precludes relief under that section.  Alt v. Commissioner, supra at 313.

The parties agree that the only factors in dispute are whether Ms. Garavaglia knew or should have known that there were understatements of tax in filing the 1989 and 1990 joint returns and whether it would be equitable to hold her liable for the understatements.  We answer both questions in the affirmative and therefore find that Ms. Garavaglia is not entitled to relief under section 6015(b).

1.   Ms. Garavaglia's Knowledge

With respect to the knowledge requirement of section 6015(b)(1)(C), a spouse has "reason to know" of an understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the understatement.  Factors to be considered in analyzing whether the alleged innocent spouse had "reason to know" of the understatement include:  (1) The spouse's education;

(2) the spouse's involvement in the couple's business and financial affairs; (3) the presence of unusual or lavish expenditures inconsistent with the couple's past levels of income, standard of living, and spending patterns; and (4) the evasiveness and deceit of the nonrequesting spouse concerning the couple's finances. See Greer v. Commissioner, 595 F.3d 338, 346-347 (6th Cir. 2010) (citing Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989)), affg. T.C. Memo. 2009-20.

### a. Education

Ms. Garavaglia has a high school education.

### b. Involvement in Business and Financial Affairs

Ms. Garavaglia contends that she was not involved in the family's financial affairs. Being a homemaker and lacking sophistication in financial affairs does not alone relieve a taxpayer of joint and several tax liability. Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310. Nor does failing to inquire into the family's financial and tax situation, especially where such an inquiry would have required minimal effort on the part of the requesting spouse. See id. Ms. Garavaglia contends that she looked only at the tops of the pages of the 1989 and 1990 joint returns; she testified that she did not "look through any of the workings". It is well settled that the requesting spouse cannot bury his or her head in the sand or turn a blind

eye to the couple's tax filings.  See, e.g., <u>Greer v. Commissioner</u>, <u>supra</u> at 351 (and cases cited thereat).

Participation in a spouse's business affairs ordinarily negates an innocent spouse claim.  See <u>Shea v. Commissioner</u>, <u>supra</u> at 566.  Ms. Garavaglia was an officer of C&G Consultants and a part owner in Branch International.  She attended the meetings of the board of directors of C&G Consultants and recorded the minutes for those meetings.  She testified regarding the alleged loans which Mr. Garavaglia made to C&G Consultants, Trans International, and Branch International.  As evidenced by a telephone conversation with Mr. L. Yarnell on July 16, 1992, she also had unique knowledge of the location of financial records for Branch International.  We thus find that Ms. Garavaglia was more knowledgeable in the financial and business affairs of Mr. Garavaglia than she leads us to believe.

### c.    Unusual or Lavish Expenditures

The lavish lifestyle enjoyed by petitioners placed Ms. Garavaglia on further notice that the 1989 and 1990 joint returns underreported petitioners' income.  Although petitioners earned modest incomes in 1989 and 1990, they had financial assets of more than $1 million.  They also owned a lake house through C&G Consultants which they used for parties, picnics, union meetings, and storage.

### d.   Deceit of Mr. Garavaglia

Although Mr. Garavaglia perpetrated fraud on insurance companies and the Treasury, he clearly trusted Ms. Garavaglia. He named her an officer of C&G Consultants, made her a part owner in Branch International, and employed her as a secretary.  He presented the 1989 and 1990 joint returns to Ms. Garavaglia for signing and she signed those returns of her own free will.  At trial Messrs. Rogers, T. Yarnell, and D. Yarnell testified that Mr. Garavaglia never discussed workers' compensation issues with Ms. Garavaglia.  However, this does not mean that Ms. Garavaglia did not have reason to know of Mr. Garavaglia's fraudulent activities.  See Shea v. Commissioner, supra at 565-566.

### e.   Summary

On the basis of the foregoing factors and the record as whole, we conclude that Ms. Garavaglia knew or had reason to know of the understatements on the 1989 and 1990 joint returns.

### 2.   Equitable Considerations

With respect to equitable concerns under section 6015(b)(1)(D), we evaluate all of the facts and circumstances to determine whether it would be inequitable to hold Ms. Garavaglia liable for the deficiencies of Mr. Garavaglia.  The factors we consider in determining inequity for purposes of section 6015(b)(1)(D) are the same factors that we consider in determining inequity for purposes of section 6015(f).  Alt v.

Commissioner, 119 T.C. at 316. The IRS has enumerated seven threshold conditions which must be satisfied before we consider a request for relief under section 6015(f). See Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. 296, 297. The factors most commonly considered are (1) whether there has been a significant benefit beyond normal support to the spouse claiming relief, and (2) whether the failure to report the correct tax liability on the joint return results from concealment, overreaching, or any other wrongdoing on the part of the nonrequesting spouse. Hayman v. Commissioner, 992 F.2d 1256, 1262-1263 (2d Cir. 1993), affg. T.C. Memo. 1992-228.

In view of the circumstances surrounding petitioners' understatements of tax, petitioners have failed to persuade us that Ms. Garavaglia should not be held jointly and severally liable for deficiencies related to petitioners' 1989 and 1990 Federal income taxes. Ms. Garavaglia knew or should have known that petitioners underreported their income where distributions were made from companies which she either owned or served as an officer. The 1989 and 1990 joint returns omitted approximately $850,000 of income which Mr. Garavaglia received from C&G Consultants. These assets directly benefited Ms. Garavaglia, and far exceeded normal support. She willingly signed the 1989 and 1990 joint tax returns without further questioning. Ms. Garavaglia chose to turn a blind eye on tax and financial

matters, and she may not now claim ignorance. Such is especially so because she significantly benefited from the income omission. Accordingly, we hold that Ms. Garavaglia is not entitled to relief under section 6015(b).

B.    Section 6015(f)

For the reasons stated above, we conclude that Ms. Garavaglia is not entitled to relief under section 6015(f).

VIII. Alleged Violations of Constitutional Guaranties

On brief, petitioners assert that the Government violated their Fifth Amendment right to due process when CID seized but failed to return petitioners' records after the closure of the criminal proceedings against Mr. Garavaglia. Petitioners urge the Court to dismiss this case, or alternatively, shift the burden of proof as to all issues to respondent. We decline to grant either form of relief.

Whether due process is violated when evidence is destroyed in a criminal proceeding is governed by two Supreme Court cases: California v. Trombetta, 467 U.S. 479 (1984), and Arizona v. Youngblood, 488 U.S. 51 (1988). As described in Trombetta, the Due Process Clause requires criminal prosecutions to comport with prevailing notions of fundamental fairness and, under this standard, criminal defendants are to be afforded a meaningful opportunity to present a complete defense. Under California v. Trombetta, supra at 488-489, the Government has a duty to

preserve evidence which (1) "possesses an exculpatory value that was apparent before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Criminal defendants must satisfy a threshold requirement before a reviewing court considers the constitutional materiality of the evidence in question. Jones v. McCaughtry, 965 F.2d 473, 477 (7th Cir. 1992). In Youngblood, the Supreme Court held that "'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" See Jones v. McCaughtry, supra at 477 (quoting Arizona v. Youngblood, supra at 58). As the U.S. Court of Appeals for the Seventh Circuit noted in Jones:

> to demonstrate a due process violation under Youngblood and Trombetta, Petitioner must first show bad faith on the part of the government in the destruction of the * * * [evidence]. If he can satisfy this burden, he must then show the evidence possessed exculpatory value apparent before it was destroyed and that it was of such a nature that he was unable to obtain comparable evidence by other means. * * * [Id.]

The requirements for determining whether due process is violated where evidence is destroyed in the context of a civil proceeding is less clear.[20] The Fifth Amendment mandates that

---

[20]In Ferguson v. Roper, 400 F.3d 635, 638 (8th Cir. 2005), the U.S. Court of Appeals for the Eighth Circuit held that Arizona v. Youngblood, 488 U.S. 51 (1988), does not apply to
(continued...)

"No person shall * * * be deprived of life, liberty, or property, without due process of law". U.S. Const. amend. V. In <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986), the Supreme Court decided whether the negligence of a Government official violated an inmate's due process rights in the context of 42 U.S.C. sec. 1983. The Supreme Court stated that the Due Process Clause of the Fourteenth Amendment "is simply not implicated by a negligent act of an official causing unintended loss or injury to life, liberty, or property." We read <u>Daniels</u> as equally applicable in the context of an alleged violation of the Fifth Amendment Due Process Clause. <u>Daniels</u> stands for the proposition that a "deprivation" of life, liberty, or property can not result from the mere negligence of an official's conduct. However, where the Government official's conduct is intentional, reckless, or grossly negligent, a deprivation of life, liberty, or property may exist. See <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 834 (1998) (whether due process is violated when "culpability falls between negligence and intentional conduct is a matter for closer calls"). Thus, whether petitioners' due process rights were

---

[20](...continued)
claims that evidence was lost or destroyed after trial. The Court of Appeals for the Sixth Circuit apparently considered but did not decide whether <u>Youngblood</u> is applicable in the civil setting in <u>Burch v. U.S. Dept. of Agric., Food & Nutrition Serv.</u>, 174 Fed. Appx. 328, 331 (6th Cir. 2006).

violated turns on the conduct of CID's special agents in destroying those records.

We are satisfied that petitioners' due process rights were not violated under Youngblood or Daniels. Two special agents assigned to Mr. Garavaglia's criminal investigation testified that they destroyed documents seized from Trans International. That testimony revealed that the decision to destroy those documents was made only after consultation with Mr. Rogers, the owner of those documents by virtue of his ownership interest in Trans International. Mr. Rogers advised the special agents to "burn" the documents seized. We credit the special agents' testimony and do not find bad faith, recklessness, or gross negligence on their part. See United States v. LaVallee, 439 F.3d 670, 699 (10th Cir. 2006) (where tapes of correctional officers were routinely destroyed in the ordinary course of business approximately two years after their creation, the destruction of those tapes was not done in bad faith); United States v. Garza, 435 F.3d 73, 75-76 (1st Cir. 2006) (where evidence is destroyed in the course of implementing routine procedures militates against a finding of bad faith); see also United States v. Branch, 537 F.3d 582, 590 (6th Cir. 2008). This result is consistent with those reached by other Federal courts. See, e.g., Althouse v. Hill, No. CIV.A.3:02-CV-1263-D (N.D. Tex. July 25, 2002) (stating that the court was not convinced that the

unintentional destruction of records whose production might later be requested in a civil lawsuit gives rise to a due process violation); <u>Larison v. City of Trenton</u>, 180 F.R.D. 261, 268 n.9 (D.N.J. 1998) (bad faith is a necessary element in order to establish a prima facie case of intentional spoliation of evidence in the civil context).

IX.  <u>Epilogue</u>

In reaching the holdings herein, we have considered all arguments raised by the parties; and to the extent not discussed herein, we find them to be irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.