T.C. Memo. 2013-251

UNITED STATES TAX COURT

RODNEY ERIC MCCLELLAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14300-11, 14314-11.[1]        Filed October 31, 2013.

<u>Cindy L. Ho</u>, for petitioner.

<u>Kaelyn J. Romey</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  In a notice of deficiency, respondent determined

deficiencies in petitioner's Federal income tax for 2006 and 2007 as well as fraud

_____

[1]These cases are consolidated for purposes of trial, briefing and opinion.

[*2] penalties under section 6663(a) or alternatively negligence penalties under section 6662 as follows:[2]

| Year | Deficiency | Fraud penalty sec. 6663(a) | Accuracy-related penalty sec. 6662 |
|------|------------|----------------------------|-------------------------------------|
| 2006 | $86,211 | $39,279.75 | $6,767.60 |
| 2007 | 80,396 | 49,119.75 | 2,980.60 |

Petitioner, while residing in California, petitioned this Court for redetermination. After concessions, the only remaining issue for us to decide is whether petitioner is liable for the fraud penalties under section 6663(a) for 2006 and 2007. We hold that he is.

FINDINGS OF FACT

The parties' stipulation of facts with accompanying exhibits, their supplemental stipulation of facts with accompanying exhibits, and their second supplemental stipulation of facts with accompanying exhibits are incorporated herein by this reference. We find the facts accordingly.

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue.

[*3] I.     R.E. McClellan Enterprises

R.E. McClellan Enterprises (REM) is a construction drywall business owned and operated solely by petitioner. In his role as REM's sole owner, petitioner conducted all billing, invoicing, and customer deposits for REM. Petitioner was also actively involved in the day-to-day management of the business and timely paid monthly rent checks, insurance bills, utility bills and other work expenses.

Petitioner founded REM in 1994. By 2006 and 2007, the tax years at issue, petitioner had grown REM into a successful drywall business. For both tax years, REM brought in more than $1 million of gross receipts each year and, according to petitioner, business was "busy".

II.    Petitioner's business and recordkeeping practices for 2006 and 2007

Petitioner had sole control over REM's assets and records for the tax years at issue. In the 2006 and 2007 timeframe, REM had only one bank account, over which petitioner had sole signatory authority and control. In addition, petitioner alone prepared and maintained REM's books and records for the years at issue. As part of keeping REM's financial records, petitioner maintained customer invoices, tracked customer payments by making notations on the invoices, and recorded income and expenses in a handwritten ledger.

[*4] III.     Preparation of Petitioner's 2006 and 2007 tax returns

The Law Offices of Steven Moskowitz, LLP (Moskowitz) (formerly Moskowitz & Cui, LLP and Moskowitz & Nixdorf), prepared petitioner's tax returns for taxable years 2001 through 2010.

Moskowitz prepared petitioner's 2006 and 2007 returns using only information petitioner had provided in a tax organizer questionnaire. Petitioner did not provide Moskowitz with his 2006 and 2007 ledgers. In addition, Moskowitz did not perform an independent audit of REM's books and records.

IV.   Petitioner's history of noncompliance and prior audits

Petitioner has a history of noncompliance with State and Federal tax laws and has had several audits that resulted in tax deficiencies. These include the audits of his 2002 Federal income tax return, his 2000 through 2003 California employment tax returns, and his 2001 California income tax return.

A.     Petitioner's history of delinquent tax filings

Petitioner has a long history of delinquent tax filings. With the exception of the 2006 and 2007 tax years, petitioner filed his Federal income tax returns late every year between 1999 and 2009. For many of those years, petitioner also failed to pay the tax reported as due.

**[*5]** B.     2002 Federal tax return audit

In 2006 the IRS audited petitioner's 2002 Federal income tax return, which Moskowitz had prepared. In a memorandum dated August 21, 2003, Moskowitz questioned petitioner's ability to support himself in the light of the nearly $90,000 loss reported for 2002. Petitioner told Moskowitz that he had received monetary support from family and friends. In addition, petitioner executed an economic reality statement for 2002 stating that his personal living expenses were covered by "low cost living expenses plus help from family and friends", and a supplemental economic reality statement stating that "I did not pay my material bill in full each month. Also I factored invoices (Advance on invoice prior to payment). Basically robbed Peter to pay Paul."

IRS Revenue Agent Ronalda Turner (Agent Turner) was assigned to perform the 2002 audit. Agent Turner discovered that petitioner had failed to report nearly $79,000 in deposits and had underreported his income by nearly $234,000. Petitioner refused to meet with Agent Turner to offer an explanation for the unreported income and also refused to provide documents. The only explanation for the discrepancies petitioner provided Agent Turner was his "acrimonious divorce". Thus, Agent Turner had to obtain supporting documents by third-party summonses. The 2002 audit resulted in a deficiency determination.

**[\*6]** C.   The California Employment Development Department audit

The California Employment Development Department (EDD) audited petitioner's returns for 2000 through 2003.  Petitioner retained Ms. Lori Schnall[3] to assist him regarding the EDD Audit.  In a letter to Ms. Schnall, petitioner stated that he needed 30 to 60 days to go over his records because they were "atrocious".  As a result of the audit, the EDD determined that petitioner owed an additional $123,290.14 in State taxes.  Following the EDD audit petitioner engaged Independent Staffing Solutions (ISS) to help him pay his employees and prepare employment tax returns.

D.   California Franchise Tax Board audit

The California Franchise Tax Board (FTB) audited petitioner's State tax return for 2001.  The FTB audit also resulted in additional taxes due.

Despite the multiple audits of petitioner's State and Federal tax returns for 2000 to 2003, petitioner did not change his accounting practices.  Petitioner admits that for 2006 and 2007, he continued to use the same accounting methods that he had used for 2002.

---

[3]At the time petitioner sought Ms. Schnall's assistance with regard to the EDD audit, Ms. Schnall had the same address as Moskowitz's Castro Valley office.

[*7] V.      2006 and 2007 IRS audits

    A.      History of the audits

IRS Revenue Agent Laura Atherton (Agent Atherton) was assigned to audit petitioner's 2006 tax return. The 2006 audit eventually expanded to include petitioner's 2007 tax return.

Throughout the audit petitioner routinely delayed in producing documents, produced incomplete documents, and failed to produce documents altogether. In petitioner's first meeting with Agent Atherton, petitioner produced only a handwritten ledger and a few bank statements for 2006. To obtain REM's complete 2006 bank statements and deposit items, Agent Atherton had to issue a summons to Bank of America.

In addition, petitioner did not provide Agent Atherton with REM's 2006 invoices until his third interview. When asked how he kept track of his customers' balances using those invoices, petitioner replied that he had a "magic memory".

After Agent Atherton discovered petitioner's unreported income, petitioner stopped complying with document requests altogether. All in all, Agent Atherton issued a total of six information document requests and summoned petitioner's records twice in connection with the 2006 and 2007 audits. Agent Atherton also had to summon additional records from petitioner's customers, including Sutco

[*8] Construction and Magallon Construction Co., as well as petitioner's lender, IndyMac Bank.

B.  2006 audit findings

Agent Atherton's review of petitioner's books and records revealed numerous inconsistencies and substantial unreported income.  For instance, Agent Atherton's initial review of petitioner's 2006 ledger revealed that petitioner's 2006 tax return reported approximately $90,000 more in gross receipts than the amount recorded in petitioner's ledger.  Petitioner was unable to account for this discrepancy.

Agent Atherton's analysis of REM's monthly cashflow according to the ledger also revealed payments significantly in excess of deposits.  Upon further analysis, Agent Atherton discovered that petitioner had underreported income by withdrawing cash when depositing customer checks, by using the "joint check" method, and by failing to record certain check deposits as receipts.

1.  Unreported cash withdrawals

Petitioner underreported his income by excluding cash withdrawals from gross receipts, using that cash to pay labor expenses, and then deducting the labor payments as business expenses.

**[*9]** Petitioner routinely withdrew cash while depositing check payments from REM's customers. Whenever petitioner withdrew cash from a check deposit, he made a notation on the customer invoice signifying the withdrawal. However, REM's ledger would often record only the deposit amount net of the cash withdrawn as receipts.

Initially, petitioner told Agent Atherton that he mostly received payments from his customers by check and that he paid expenses also mostly by check. Petitioner also denied paying expenses with cash. In addition, petitioner claimed that he made deposits in full most of the time and only pulled cash out occasionally.

However, Agent Atherton's audit revealed that throughout 2006, petitioner withdrew a total of $163,000 in cash while making check deposits for REM, $118,400 of which was not recorded in REM's ledger as receipts. Petitioner never withdrew $10,000 or more, though he frequently made cash withdrawals slightly under $10,000. The following table summarizes the cash amounts petitioner withheld from checks in 2006:

| Date | Payer | Check amount | Cash out |
|------|-------|--------------|----------|
| 2/23 | Pacific State Bank Memo: Escolar | $10,075.00 | $5,000 |
| 3/2 | Palomino & Sons, Inc. | 17,000.00 | 8,000 |

**[*10]**

| | | | |
|---|---|---|---|
| 3/20 | Mulder-Terpstra, LLC | 12,740.00 | 8,000 |
| 4/13 | Distinctive Remodel | 10,221.25 | 9,200 |
| 4/17 | Mulder-Terpstra, LLC | 15,400.00 | 8,400 |
| 5/23 | Palomino & Sons, Inc. | 11,933.93 | 9,000 |
| 6/6 | Distinctive Construction | 14,675.00 | 9,800 |
| 6/19 | Price Homes Neibauer Job | 21,970.00 | 9,800 |
| 8/31 | Pacific State Bank, memo: Postma | 12,723.75 | 9,500 |
| 9/16 | MJK Builders, Inc. | 14,933.75 | 8,000 |
| 9/29 | GE Whitlock Construction | 17,123.75 | 6,000 |
| 10/11 | Sutco Construction, Inc. | 51,740.00 | 8,400 |
| 10/12 | GE Whitlock Construction | 14,677.50 | 9,600 |
| 10/13 | Calvin Andree and Nancy Andre/Andre Trust | 18,042.50 | 9,600 |
| 10/18 | MJK Builders, Inc. | 10,250.00 | 9,800 |
| 11/6 | Calvin Andree and Nancy Andre/Andre Trust | 16,215.00 | 9,800 |
| 11/14 | Paul & Sheila Van Konynenburg | 21,726.25 | 9,800 |
| 11/18 | GE Whitlock Construction | 17,123.75 | 9,900 |
| 11/22 | Paul & Sheila Van Konynenburg | 11,698.75 | 6,000 |
| Total | | | $163,600 |

Petitioner used these cash withdrawals to pay his laborers. These cash payments were made in addition to the payroll amounts petitioner had reported to ISS. For example, petitioner admits that he paid Juan Manual Lopez $55,825 in excess of what he reported to ISS. In addition, petitioner paid over 10

[*11] independent contractors in cash. Petitioner then deducted these cash payments as business expenses.

2. "Joint Check" system

Petitioner also obfuscated income using the "joint check" system. Under the joint check system, petitioner purchases materials from a materials supplier, who then files a lien on the purchased materials. The supplier releases the lien when REM's customer issues a joint check payable to both REM and the supplier. At that point, petitioner signs the check over to the supplier so that the supplier, rather than petitioner, receives the funds from the check. Petitioner's practice was to have REM's customers write two checks: one check to REM to cover only nonmaterials costs and one check to REM and the materials supplier jointly for the materials. For example, in 2006 petitioner paid Delta Materials Supply over $100,000 in material costs using the joint check method. Petitioner did not report the payment for materials as part of his gross receipts but deducted those materials costs as business expenses.

3. Deposits not reported as income

Finally, petitioner underreported income by sometimes failing to record bank deposits. In 2006 petitioner deposited approximately $94,000 in REM's

[*12] bank account without recording it on REM's ledger and without reporting it on his return.

C. 2007 audit findings

Agent Atherton's audit of petitioner's 2007 tax return revealed that petitioner continued many of the same practices in 2007. For instance, petitioner continued to withdraw cash from check deposits. In 2007 petitioner made cash withdrawals totaling $241,300, of which $155,350 was not recorded in REM's ledger as part of gross receipts. As before, none of petitioner's cash withdrawals equaled or exceeded $10,000, though on numerous occasions petitioner withdrew amounts slightly less than $10,000.

The following table summarizes the cash amounts petitioner withheld from checks in 2007:

| Date | Payer | Check amount | Cash out |
|------|-------|--------------|----------|
| 1/30 | Standard Pacific Homes--Central Valley | $26,272.00 | $9,200 |
| 2/15 | William Mulder Construction | 16,355.00 | 9,300 |
| 2/27 | McRoy-Wilbur Communities, Inc. | 15,933.75 | 9,900 |
| 3/9 | Standard Pacific Homes--Central Valley | 41,185.00 | 9,800 |
| 3/18 | Michael J. Kinch | 11,553.75 | 9,800 |
| 3/23 | Standard Pacific Homes--Central Valley | 41,892.25 | 9,800 |
| 4/3 | McRoy-Wilbur Communities, Inc. | 18,210.00 | 9,800 |

**[*13]**

| | | | |
|---|---|---:|---:|
| 4/2 | Magallon Construction Co. | 15,184.00 | 9,800 |
| 4/9 | Craig Podesta | 27,500.00 | 9,800 |
| 5/2 | McRoy-Wilbur Communities, Inc. | 11,381.25 | 9,900 |
| 5/7 | Gary Tschantz Construction, Inc. | 5,750.00 | 4,450 |
| 5/7 | Gary Tschantz Construction, Inc. | 5,750.00 | 4,450 |
| 5/6 | Craig Podesta | 12,815.00 | 7,000 |
| 5/7 | Standard Pacific Homes--Central Valley | 26,002.25 | 9,800 |
| 5/15 | GK Commercial Properties | 21,385.00 | 9,800 |
| 5/20 | Deann and Gary Autrey | 14,527.50 | 9,500 |
| 5/29 | Terry Alkire | 14,900.00 | 9,100 |
| 5/15 | Sutco Construction, Inc. | 14,240.00 | 9,200 |
| 6/19 | Joel W. Geddes, Jr. | 29,400.00 | 2,300 |
| 6/26 | Jorgensen Finance | 10,348.00 | 9,000 |
| 7/19 | Terry Alkire | 12,325.00 | 9,800 |
| 7/20 | The Grevemberg Co., Inc. | 11,800.00 | 9,800 |
| 9/20 | Palomino & Sons, Inc. | 15,187.50 | 9,800 |
| 9/14 | Standard Pacific Homes--Central Valley | 46,659.75 | 9,800 |
| 10/8 | Pac Northwest Development, LLC | 5,000.00 | 2,400 |
| 10/19 | Palomino & Sons, Inc. | 5,000.00 | 5,000 |
| 10/14 | Palomino & Sons, Inc. | 4,000.00 | 3,000 |
| 11/7 | Palomino & Sons, Inc. | 10,000.00 | 6,000 |
| 11/28 | Roman Salazar | 10,147.50 | 8,000 |
| 12/22 | The Grevemberg Co., Inc. | 10,500.00 | 6,000 |
| Total | | | $241,300 |

[*14] In addition, petitioner continued to make unreported bank deposits. In 2007 petitioner deposited nearly $84,000 into REM's bank account without recording it in REM's ledger or reporting it on his 2007 return.

D. 2006 and 2007 audit result summary

All in all, Agent Atherton determined that petitioner had underreported income by over $146,000 for 2006 and over $190,000 for 2007. The following table summarizes Agent Atherton's calculation of petitioner's unreported income for the years at issue:

| | 2006 | 2007 |
|---|---|---|
| Book income | $928,658.43 | $836,667.12 |
| Add: | | |
| Income from customer deposits not reported in books | 94,388.50 | 83,899.28 |
| Withheld cash omitted from receipts reported in books[1] | 118,400.00 | 155,350.00 |
| Accounting errors | --- | 2,470.00 |
| Subtract: | | |
| Non-taxable income reported as taxable | 27,220.50 | 50,924.46 |
| Totals: | | |
| Income per examination | 1,114,226.43 | 1,027,461.94 |
| Income per return | 967,845.00 | 836,616.00 |
| Petitioner's unreported income | 146,381.43 | 190,845.94 |

[1]This figure includes sources of nontaxable income such as petitioner's Bank of America loans and travel funds.

[*15] Petitioner concedes respondent's determinations of the amounts of underreported income.

## VI.    Petitioner's undisclosed assets and bank account

Petitioner owned several assets which were omitted from his 2006 and 2007 returns. Petitioner waited until his third interview with Agent Atherton before disclosing that he owned several investment properties in Washington on which he was constructing homes to sell for a profit. Petitioner explained that some of the properties were in his niece's name in order to shield those assets from his divorce proceedings. Petitioner further disclosed that he controlled another bank account in his son's name from which he paid the construction costs of the Washington properties.

## VII.   Petitioner's explanation for the 2006 and 2007 unreported income

Petitioner asserts that his failure to report all his income was due to circumstances in his personal life, including medical problems, a divorce, and the ailing health of his father, rather than fraud.

### A. Petitioner's medical problems

Petitioner claims that he suffered from a variety of medical conditions which impeded his ability to keep accurate books and records. These medical conditions include stroke, transischemic attacks (TIAs), hydrocephalus (a.k.a.

**[*16]** ventriculomegaly), and stress syndrome. Petitioner, however, never mentioned these health issues nor any cognitive disability to Agent Atherton until after the 2006 and 2007 audits were complete.

1.      Stroke

Petitioner suffered a stroke in 1999 and has not suffered another one since.

2.      TIA

Petitioner describes a TIA as essentially a ministroke with attendant symptoms such as confusion, fatigue, headache, and dizziness. Such episodes would last only several days. According to Dr. John Warwick, petitioner's primary care physician since 1994, petitioner suffered from TIA episodes in 2003 and 2004. However, office visit tests revealed "minimal neurologic or physical findings".

3.      Hydrocephalus

Hydrocephalus is an enlargement of the ventricles in the storage unit of the brain. Dr. Warwick testified that petitioner experienced cognitive impairment from hydrocephalus in early 2000 and that symptoms peaked in 2003-2004. Because of his hydrocephalus, petitioner experienced short episodes of cognitive impairment approximately once every two to three months. According to Dr. Warwick, petitioner could drive a car, communicate, and generally take care of

[*17] himself during such episodes. In 2003 petitioner received a ventriculogram for his hydrocephalus following which he experienced rapid improvement in symptoms.

4.      Stress syndrome

Dr. Warwick also diagnosed petitioner with stress syndrome, which is characterized by excessive adrenaline caused by various life factors. Petitioner experienced episodes of stress syndrome from 1994 through 2005, with each episode lasting for a day or two. According to Dr. Warwick, any cognitive impairment would be limited to blunted affect and temporary memory loss. Dr. Warwick proscribed petitioner Wellbutrin, a mood stabilizer, to help him manage his stress.

5.      Petitioner's office visits in 2006 and 2007

Petitioner sought medical treatment from Dr. Warwick on at least four occasions in 2006 and one occasion in 2007. Dr. Warwick's medical records and notes from 2006 and 2007 show no mention of petitioner's 1999 stroke, TIA, hydrocephalus, stress syndrome, or associated symptoms during those office visits.

Dr. Warwick's records also show that in 2007 petitioner made an office visit to obtain a letter to the IRS verifying his medical condition. Dr. Warwick testified that he drafted such a letter to the IRS for petitioner. Petitioner, on the other hand,

[*18] claims that he did not have any letters from Dr. Warwick regarding his health problems and their impact on his ability to conduct his business.

B.  Petitioner's divorce

Petitioner further attributes his inaccurate tax returns to his "messy divorce".  Petitioner and his former wife legally separated in mid-2005, and their divorce was finalized in December 2006.  According to petitioner, the divorce was devastating, left him "extremely depressed", and made it difficult for him to operate his business.  Petitioner further claims that the financial implications of the divorce extended into 2007, though he did not explain why or how.

C.  Health problems of Petitioner's father

Finally, petitioner attributes the inaccuracies in his tax returns to his father's poor health.  According to petitioner, his father suffered from Alzheimer's disease in 2006 and required significant assistance from petitioner.

OPINION

I.  Perception of witnesses

During our trial we heard the testimony from Agent Atherton, Agent Turner, Dr. Warwick, and petitioner.  As the trier of fact, our charge is to review the credibility of witnesses and evaluate the reliability of evidence for purposes of finding disputed facts.  In discharging that duty, we observe the truthfulness,

[*19] candor, and demeanor of each witness to evaluate his or her testimony. HIE Holdings, Inc. v. Commissioner, T.C. Memo. 2009-130, 97 T.C.M. (CCH) 1672, 1733 (2009), aff'd, 521 Fed. Appx. 602 (9th Cir. 2013). We weigh the evidence, draw necessary inferences, and resolve disputed facts with a view toward ascertaining the truth. Id.

We found the testimony of Agent Turner, Agent Atherton, and Dr. Warwick to be informed and credible. The testimony of Agent Turner and Agent Atherton was supplemented by extensive audit documentation and helpful to understanding petitioner's exclusion of customer checks from his sales receipts, withdrawal of cash from customer deposits, and understatement of gross receipts. Similarly, Dr. Warwick's testimony was corroborated by petitioner's medical records. The credible testimony of these witnesses clearly and convincingly establishes that petitioner acted with fraudulent intent; the same testimony also shows that petitioner lacked reasonable cause for underreporting his income.

As to petitioner, we generally found his testimony to be self-serving, improbable, internally inconsistent, and contradicted by documentary evidence and stipulated facts. We illustrate these contradictions through the following examples.

[*20] First, petitioner made contradictory statements regarding his use of cash in conducting REM's business. Initially, petitioner represented to Agent Atherton that he paid expenses mostly by check and only rarely withdrew cash from checks. However, as REM's records show, petitioner withdrew over $160,000 in cash from checks in 2006 and over $240,000 in 2007. Petitioner later admitted to making these cash withdrawals but stated that they were used to pay labor expenses.

Second, petitioner's pattern of behavior belies his testimony regarding his understanding of the IRS reporting requirement for cash withdrawals. Petitioner testified at trial that his understanding was that cash withdrawals over $5,000 must be reported to the IRS. However, petitioner's books and records show that he always withdrew less than $10,000 regardless of the check's face amount. It could not be a mere coincidence that petitioner withdrew between $9,000 and $9,900 in over 10 instances in 2006 and in 20 instances in 2007. Petitioner's pattern leads us to conclude that petitioner was well aware of the $10,000 threshold that would trigger the bank's reporting requirement to the IRS. See, e.g., 31 C.F.R. sec. 1010.311 (2011).

Third, the stipulated facts contradict petitioner's testimony that he received help in keeping REM's books and records. Throughout the 2006 and 2007 audits

[*21] and in stipulated facts, petitioner represented that he was the sole keeper of records for REM at all times. At trial, however, petitioner testified that in 2006 he hired a bookkeeper for three to four months to assist him in maintaining his books and records. According to petitioner, he paid her in cash but had no record of her employment and did not report his payments to her as a business expense. When questioned about why he never mentioned this bookkeeper until trial, petitioner claimed that he had "completely forgotten about her until over the weekend".

Fourth, petitioner's testimony that Dr. Warwick never drafted any letters concerning his medical condition is contradicted by Dr. Warwick's testimony that he had drafted a letter on petitioner's behalf and by Dr. Warwick's medical records. We credit Dr. Warwick's testimony. In the light of his testimony and medical records, which show that petitioner's medical problems had largely been resolved by 2006 and 2007, we believe that Dr. Warwick's letter was unfavorable to petitioner.

## II.    Section 6663 fraud penalty

Section 6663(a) imposes a 75% penalty on the portion of any underpayment of tax attributable to fraud. Section 6663(b) provides that where the Commissioner establishes that any portion of an underpayment of tax is attributable to fraud, the entire underpayment is treated as attributable to fraud

**[*22]** except with respect to the portion of the underpayment that the taxpayer

establishes, by a preponderance of the evidence, is not attributable to fraud.

The Commissioner bears the initial burden of establishing fraud by clear

and convincing evidence.  Sec. 7454(a); Bradford v. Commissioner, 796 F.2d 303,

307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Scharringhausen v.

Commissioner, T.C. Memo. 2012-350 at *34.  Clear and convincing evidence is:

> "that measure or degree of proof which will produce in the mind of
> the trier of facts a firm belief or conviction as to the allegations
> sought to be established.  It is intermediate, being more than a mere
> preponderance, but not to the extent of such certainty as is required
> beyond a reasonable doubt as in criminal cases.  It does not mean
> clear and unequivocal."

Scharringhausen v. Commissioner, at *34 (quoting Ohio v. Akron Ctr. for Reprod.

Health, 497 U.S. 502, 516 (1990)).  To carry his burden, the Commissioner must

prove for each year in which fraud is alleged that (1) an underpayment of tax

existed and (2) a portion of the underpayment was attributable to fraud.  Petzoldt

v. Commissioner, 92 T.C. 661, 698 (1989); Scharringhausen v. Commissioner, at

*34.  Because respondent has met his burden with clear and convincing evidence,

and because petitioner has failed to show any portion of the underpayment was not

attributable to fraud, we sustain the fraud penalty.

**[*23]** A.   Existence of underpayment for 2006 and 2007

Respondent determined that petitioner had underreported his income by $146,382 for 2006 and $190,846 for 2007.  Petitioner concedes the resulting underpayments.

B.   Underpayments attributable to fraud

Fraud is defined as the intentional commission of an act or acts for the specific purpose of evading tax believed to be owing.  Petzoldt v. Commissioner, 92 T.C. at 698; Scharringhausen v. Commissioner, at *36-*37.  Whether a portion of the underpayment of tax is attributable to fraud is a question of fact to be resolved on the basis of the record as a whole.  Parks v. Commissioner, 94 T.C. 654, 660 (1990); Scharringhausen v. Commissioner, at *36.  Fraudulent intent is never imputed or presumed but must always be established by independent evidence.  Petzoldt v. Commissioner, 92 T.C. at 699.

Because fraud is rarely admitted and the taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts.  Id.  The intent to conceal or mislead may be inferred from a pattern of conduct.  Id.

There are several, nonexclusive "badges of fraud" from which the Court may infer a taxpayer's fraudulent intent, including:  (1) understating income, (2)

[*24] maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, and (9) dealing extensively in cash. Bradford v. Commissioner, 796 F.2d at 307-308; Scharringhausen v. Commissioner, at *37. Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence. Garavaglia v. Commissioner, T.C. Memo. 2011-228, 102 T.C.M. (CCH) 286, 302 (2011), aff'd, 521 Fed. Appx. 476 (6th Cir. 2013). After thoroughly examining the record, we found the presence of several indicia of fraud such as: (1) understating income, (2) maintaining inadequate records, (3) giving implausible explanations of behavior, (4) concealing assets, (5) failing to cooperate with tax authorities, and (6) dealing extensively in cash. The presence of six of the nine factors convinces us that petitioner harbored the requisite fraudulent intent.

      1.       Understatement of income

The understatement of income tends to indicate fraudulent intent. Bradford v. Commissioner, 796 F.2d at 307-308. This is especially true where there is a pattern of understating income over multiple years. Holland v. United States, 348

[*25] U.S. 121, 139 (1954). Petitioner concedes that he understated his income by $233,000 for 2002, $146,382 for 2006, and $190,846 for 2007. This factor weighs against petitioner.

2. Maintaining inadequate records

The failure to maintain adequate records is indicative of fraudulent intent. Bradford v. Commissioner, 796 F.2d at 307-308. Petitioner did not maintain accurate records of REM's financial affairs. First, petitioner failed to record in his ledger $118,400 of receipts for 2006 and $155,350 for 2007, which he withdrew as cash from customer checks. Petitioner further failed to record in his ledger as receipts bank deposits of $94,388.50 for 2006 and $83,899.28 for 2007. In addition, petitioner admits that he paid his employees additional cash not reflected in his payroll records with ISS.

Petitioner's culpability for maintaining inaccurate records is increased by the results of his prior tax audits: the 2002 Federal audit, the EDD audit, and the FTB audit. Despite the fact that all three audits resulted in tax deficiencies, petitioner continued to use the same accounting and bookkeeping methods. The results of these audits, coupled with petitioner's failure to reform REM's accounting practices, make it simply impossible to find that petitioner acted in

[*26] good faith. Petitioner's practice of maintaining inadequate and inaccurate records weighs against him.

### 3. Implausible explanations

Giving implausible or inconsistent explanations of behavior is indicative of fraud. Id. Petitioner's explanations for his behavior are implausible and inconsistent. Apart from petitioner's self-serving testimony, nothing in the record indicates that in 2006 and 2007 he suffered from medical conditions that impaired his ability to maintain adequate business records. Petitioner's primary care physician, Dr. Warwick, testified that petitioner no longer experienced symptoms from the 1999 stroke, TIAs, stress syndrome, or hydrocephalus as of 2006 and 2007.

Agent Atherton testified that when questioned about his ability to keep track of REM's finances from the scant records, petitioner claimed that he had "magic memory". Moreover, petitioner did not claim to have had health problems until after the audit was completed.

Finally, petitioner actively and successfully managed REM's business affairs in 2006 and 2007, in which he brought in over $1 million of business per year. Petitioner was intimately involved in REM's activities, including bidding on

[*27] new projects, maintaining REM's books, preparing customer invoices, and paying expenses.

Petitioner's claim that medical conditions prevented him from keeping accurate business records is inconsistent with Dr. Warwick's and Agent Atherton's testimony and highly implausible in the light of the fact that he single-handedly and successfully managed every aspect of REM's business operations for the years at issue. This factor weighs against petitioner.

4.    Concealing assets

Concealing assets is further indicative of fraud. Bradford v. Commissioner, 796 F.2d at 307-308. Petitioner concealed the full extent of his income by keeping it off REM's books in several ways. First, petitioner kept income off his books by not recording cash withdrawn from check deposits. Petitioner's pattern of withdrawing cash amounts just short of the $10,000 bank reporting threshold, regardless of the check's face amount, is emblematic of his intent to conceal income. Next, petitioner kept significant income off the books using the joint check system for material expenses yet deducted those amounts as business expenses. Finally, petitioner also concealed several Washington investment properties held in his niece's name and a bank account in his son's name which contained the funds used to develop those properties. Taken together, these

**[*28]** actions constitute a deliberate and methodical attempt to conceal income and assets. This factor weighs against petitioner.

> 5.       Failure to cooperate with tax authorities

Failing to cooperate with tax authorities is indicative of fraud. Id. Petitioner was uncooperative with Agent Atherton during the course of the 2006 and 2007 audits. Petitioner produced incomplete documents or simply ignored Agent Atherton's document requests. All in all, Agent Atherton issued a total of six information document requests, summoned petitioner's records twice, and summoned additional records and information from multiple third parties. Petitioner also made misrepresentations to Agent Atherton, including statements that he rarely dealt in cash and that REM generally conducted its business using only checks. This factor weighs against petitioner.

> 6.       Extensive dealings in cash

Extensive dealing in cash is indicative of fraud. Scharringhausen v. Commissioner, at *37. Petitioner dealt extensively in cash by withholding cash when depositing checks. In 2006 and 2007 petitioner routinely withdrew from check deposits cash totaling over $160,000 in 2006 and over $240,000 in 2007; he also used the cash to pay his employees on top of reported payroll expenses. This factor also weighs against petitioner.

**[\*29]**     7.     Conclusion

On the basis of our finding that six of the nine factors weigh against petitioner, we conclude that respondent has proven by clear and convincing evidence that petitioner acted with fraudulent intent.

C. Section 6664 reasonable cause

Under section 6664(c)(1), fraud penalties do not apply to any portions of the underpayments of tax for which petitioner proves reasonable cause and good faith. Section 1.6664-4(b)(1), Income Tax Regs., interprets "reasonable cause" as:

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * *

Petitioner carries the burden to prove by a preponderance of the evidence that he acted with reasonable cause and good faith. See sec. 6663(b).

Petitioner argues that he meets the section 6664(c)(1) reasonable cause defense because his diminished mental and physical capacity precludes a finding of fraud. Petitioner has failed to meet his burden by a preponderance of the evidence. The record contains no credible evidence that petitioner's medical

[*30] conditions interfered with his ability to conduct his business affairs in 2006 and 2007. During those years, petitioner single-handedly performed all of REM's core management and accounting functions, bid for new projects, and brought in over $1 million of business per year. REM's success demonstrated that petitioner adequately and competently managed REM's business affairs during the years at issue.

Furthermore, petitioner did not mention any medical impediments during the 2006 and 2007 audits and even extolled his "magic memory" during interviews with Agent Atherton. Dr. Warwick's testimony and medical records show that any diminished capacity resulting from petitioner's 1999 stroke, TIA, stress syndrome, or hydrocephalus had largely been resolved before 2006 and 2007. In 2006 and 2007 petitioner sought medical treatment from Dr. Warwick on at least five separate occasions, yet on no occasion did petitioner mention that he suffered from the medical conditions that he now argues impaired his cognitive abilities.

Finally, petitioner argues that he was going through a difficult period because of his divorce and the poor health of his father. While we credit this part of his testimony, petitioner has failed to establish that these personal events caused his understated income. First, we note that petitioner successfully ran REM's business affairs in those same years. Second, petitioner's divorce, which was

[*31] finalized by 2006, cannot account for his 2007 deficiency. Third, petitioner's prior audits established a long history of keeping inaccurate records and underreporting his tax liabilities that predates his divorce and his father's poor health. For these reasons, we do not find credible petitioner's argument that his 2006 and 2007 underpayments were due to these personal events.

In the light of the foregoing discussion, we are convinced that petitioner's underreporting of income for the years at issue was attributable to fraud. The record also fails to establish by a preponderance of the evidence that petitioner acted reasonably and in good faith. Consequently, we sustain respondent's determinations of the fraud penalties.

_____

Any arguments not discussed in this opinion are irrelevant, moot, or lacking in merit.

To reflect the foregoing,

Decisions will be entered for

respondent.